[Cite as *State v. Moon*, 2013-Ohio-395.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 25061 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 11-CR-1356/3 |
| v. | : | |
| | : | |
| EARL L. MOON | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 8th day of February, 2013.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by R. LYNN NOTHSTINE, Atty. Reg. #0061560, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, Post Office Box 972, 301 West Third Street, Dayton, Ohio 45422
　　　　Attorney for Plaintiff-Appellee

JAMES S. ARMSTRONG, Atty. Reg. #0020638, 131 North Ludlow Street, Suite 386 Talbott Tower, Dayton, Ohio 45402-1731
　　　　Attorney for Defendant-Appellant

. . . . . . . . . . . .

FAIN, P.J.

{¶ 1}　Defendant-appellant Earl Moon appeals from his conviction and sentence on two counts of Murder, in violation of R.C. 2903.02(B), with firearm specifications; twelve

counts of Aggravated Robbery, in violation of R.C. 2911.01(A), with firearm specifications; and one count of Having a Weapon While Under a Disability, in violation of R.C. 2923.13(A)(2). Moon contends that his convictions are against the manifest weight of the evidence, and that the trial court erred in overruling his motion to suppress eyewitness identification evidence.

{¶ 2} We conclude that Moon's convictions are not against the manifest weight of the evidence. We also conclude that the trial court did not err in overruling his motion to suppress. The procedure used by the police in conducting the photo-spread identifications was not in compliance with R.C. 2933.83, because a blind administrator, as defined therein, was not used, and the impracticality of using a blind administrator was not documented. Nevertheless, the procedure followed was not unduly suggestive; therefore, it did not violate Moon's rights under the Due Process Clause, and the remedy of exclusion was not triggered. Accordingly, the judgment of the trial court is Affirmed.

## I. Three Men Rob a Boot Joint at Gunpoint,
## and in the Process Shoot and Kill the Owner and One Patron

{¶ 3} Earnest "Hank" Sanders operated a "boot joint" in the basement of his residence. He sold liquor and food, without a license. Many of his patrons worked in regular bars, and came to Sanders's place after work to relax and be waited upon. Shawn Dentel, who lived with him, assisted in the running of the boot joint.

{¶ 4} During the early morning hours of November 14, 2010, Sanders was open for business. Three young men, described as about twenty years old, entered the bar. All three

were African-American. One, later identified as Keron Simpson, had a much darker complexion than the other two; he also had dreadlocks. Of the two lighter-skinned men, the one later identified as Daviontae Norvell had somewhat darker skin than the other, who was later identified as Moon. Moon had hazel-colored eyes, which at least one witness described as distinctive.

{¶ 5}    The three men sat by themselves at a table near the restroom. Sanders did not generally cater to persons as young as the three men, but he went over to them and was seen shaking hands with them after talking with them for about 45 minutes. Dentel took this to mean that Sanders was O.K. with them. Over about an hour, the three each had three "Bud Ice" beers. Their beer bottles were deposited in a trash container, which was periodically emptied into an outside trash container, specific to the Sanders residence.

{¶ 6}    Suddenly, the three men, each with gun drawn, announced their intention to rob the boot joint and its patrons. One of the men began backing Sanders up. Sanders was shot in the leg, although it is not clear who fired the shot. Sanders's femoral artery was severed; he bled to death. Another shot was fired. Michelle Carter, one of the patrons, was shot in the head, and appeared to die instantly. From the record, it appears possible, if not likely, that Carter was not an intended target, but had the misfortune to have been in the wrong place at the wrong time.

## II.    The Course of Proceedings

{¶ 7}    Moon, Simpson, and Norvell were ultimately charged by indictment with the crimes committed at the boot joint. All three moved to suppress eyewitness identification

evidence. A joint hearing on their motions was held, following which the trial court rendered a decision denying the motions.

{¶ 8} Subsequently to the denial of the motions to suppress, the police became aware that Michael Stephens, a prisoner in the Butler County Jail, had information linking Moon, whom he knew, to the crimes. Police officer Rebecca Rose went to the Butler County Jail and conducted a photo-spread identification procedure with Stephens to make sure that the person he was talking about was the same person as the Earl Moon who was the defendant in this case. That procedure was conducted in the presence of Stephens's attorney, and resulted in the identification of Moon.

{¶ 9} Moon filed a new motion to suppress the Stephens identification. The trial court heard it, and denied it. Because Stephens did not testify at Moon's trial, the propriety of this ruling is not an issue in this appeal.

{¶ 10} The trial court granted Moon's motion to sever his trial from that of the other defendants. With the exception of the Having a Weapon While Under a Disability count, which was tried to the court, Moon was tried to a jury. He was convicted on all counts and specifications. From his convictions and sentence, Moon appeals.

III. **The Photo-Spread Identification Procedure in this Case, While Not in Compliance with R.C. 2933.83, Was Not Unduly Suggestive**

{¶ 11} Moon's First Assignment of Error is as follows:

THE TRIAL COURT ERRED IN OVERRULING THE MOTION TO SUPPRESS THE PHOTO SPREAD IDENTIFICATIONS AS POLICE FAILED TO

COMPLY WITH R.C. §2933.83 AND SAID IDENTIFICATIONS WERE UNDULY SUGGESTIVE AND UNRELIABLE.

{¶ 12}   When Moon, Simpson, and Norvell were identified as possible suspects in the crimes, Dayton Police Detective Rebecca Rose assembled three photo-spreads to show to the eyewitnesses, one for each suspect.   By this time, R.C. 2933.83 was in effect, governing the procedure for photo-spread identifications.   The Dayton Police Department had incorporated the statutory requirements into its own written policy for eyewitness identification.

{¶ 13}   Rose used JusticeWeb, a regional computer data base of photographs and identifiers, to assemble the photo-spreads.   Each spread had six photos, one of which was one of the three suspects, with the other five being "fillers."   Rose used the program's default parameters for the permitted variance in the height, weight and age of the fillers.   The statute does not require the use of JusticeWeb to compile a photo-spread.

{¶ 14}   Although the statute does not require it, Rose used color photographs.   A color photo-spread was shown to each eyewitness, and if an identification was made, the appropriate selection was marked on a black-and-white copy of the photo-spread.

{¶ 15}   Fillers with similar skin-color were chosen.   Rose was concerned about Simpson's distinctive hairstyle, and Moon's distinctive, hazel colored eyes.   She made efforts to choose fillers that were as similar as possible, but only was able to find one filler with hazel colored eyes.   She did find another filler, for Moon's photo-spread, with "different" colored eyes.   The other three fillers had brown eyes.

{¶ 16}   Rose let the computer randomly select the position that the suspect would occupy in the photo-spread.   She testified that if one suspect's position had been the same as

another's (e.g., Simpson is in position number three in his spread, and Moon is also in position number three in Moon's spread), she would have re-shuffled, so that each suspect would occupy a different position in that suspect's spread. She testified that she would have done this to avoid the possibility that a witness, having identified one suspect, would conclude that the suspect in a subsequent photo-spread would be found in the same position. As it happened, each suspect occupied a different position in that suspect's photo-spread generated by the computer. Moon was in position number one in his photo-spread.

{¶ 17} Rose also wanted to conduct the photo-spread identifications by the various witnesses at the same time, to the extent possible, to minimize the risk that the witnesses would discuss the identifications with each other, even though they were instructed not to do so. For this reason, three teams of officers conducted photo-spread identifications, using the photo-spreads Rose had generated, on January 3, 2011, with all but one of the witnesses. The remaining witness, Vanessa Dubbins, was shown the photo-spread the next day. She could not identify Moon, and she did not testify at Moon's trial.

{¶ 18} Rose administered the photo-spread identification to seven witnesses. Three of these could not identify any of the suspects. Three, including Terrance Jones, who testified at trial, identified Moon. Another witness, Joe Barnes, said that Moon and one filler looked like the perpetrator with the hazel eyes, but could not positively identify Moon. Rose testified that she read the instructions to the witnesses verbatim, with the exception of the statement that she did not know who the suspect was. Of course, she did know who each suspect was. The instructions included the statement that the perpetrator might, or might not, be included in the photo-spread. Rose testified that she did not pressure any witness to make an

identification, accepted the witness's failure to make an identification immediately, without any further discussion or comment, and did not inform any of the witnesses that they had correctly identified the suspect.

{¶ 19} Dayton Police Detective Gregory Gaier administered the photo-spread identification to two witnesses. Shawn Dentel identified Moon, and testified at trial. Joel Kimbell did not identify Moon. Gaier followed the same procedure that Rose followed.

{¶ 20} Dayton Police Detective Kevin Phillips administered the photo-spread identification to three witnesses. Annette Dillard did not identify Moon. She did testify at his trial, but was not able to identify him. Brian Whiteside and Erica Peek both identified Moon, but neither testified at trial. Phillips followed the same procedure that Rose followed, except that he did read that part of the instructions that said that he did not know who the suspect was, even though he did, in fact, know who each suspect was.

{¶ 21} In arguing that the photo-spread identification procedure was unduly suggestive, Moon principally relies upon the fact that blind administrators were not used. R.C. 2933.83(B)(1) requires that a blind or blinded administrator shall conduct a photo lineup, "unless impracticable." R.C. 2933.83(B)(2) requires that when it is impracticable for a blind administrator to conduct the lineup, "the administrator shall state in writing the reason for that impracticability."

{¶ 22} A "blind administrator" is an administrator who does not know the identity of the suspect. R.C. 2933.83(A)(2). A "blinded administrator" is an administrator who knows the identify of the suspect, but does not know which lineup member is being viewed by the eyewitness. R.C. 2933.83(A)(3).

{¶ 23} There is no question that the police officers who administered the photo-spread identifications to the twelve eyewitnesses on January 3 and 4, 2011, were neither blind nor blinded administrators, as defined by the statute. There is also no question that none of them stated in writing the reason why it was impracticable to have a blind or blinded administrator conduct the procedure. Thus, R.C. 2933.83 was not complied with, and the trial court so found.

{¶ 24} Rose, who knew about the new statutory requirements, did testify why she did not use blind administrators. She testified that the department was short-handed, and that one of the suspects, Simpson, was notorious within the department because he had recently been accused of having shot a Dayton police officer's son in the face. And she testified that they wanted to conduct all twelve photo-spread identifications in as brief a time as possible, so as to avoid the likelihood of the witnesses discussing the identifications with one another. To the extent that these circumstances may have constituted an impracticality, in Moon's case, of using blind or blinded administrators, they were not documented in writing.

{¶ 25} Rose and the other officers also testified that when these photo-spreads were shown to the eyewitnesses, this matter was proceeding as a federal investigation, and it was understood that it would be a federal prosecution, which is not subject to blind administrator requirements. While this may have been a reason for the officers' failure to have complied with Ohio statutory requirements, it would not constitute impracticality.

{¶ 26} The Ohio statute also provides for some consequences for failure to comply. Failure to comply "shall be considered by trial courts in adjudicating motions to suppress eyewitness identification resulting from or related to the lineup." R.C. 2933.83(C)(1). And when evidence of failure to comply is presented at trial, "the jury shall be instructed that it

may consider credible evidence of noncompliance in determining the reliability of any eyewitness identification resulting from or related to the lineup." R.C. 2933.83(C)(3).

{¶ 27} The trial court issued an eleven-page decision overruling the motion to suppress, in which it gave consideration to the fact that the police officers administering the photo-spread identifications failed to comply with the blind-administrator requirements of the statute. At trial, Moon's counsel touched upon the failure of the police to comply with legal requirements, generally, in voir dire, discussed the failure to comply with the blind-administrator requirements of the statute in opening statement, cross-examined the appropriate witnesses on that subject, and argued non-compliance with the blind-administrator requirements during closing argument. And the trial court appropriately instructed the jury concerning the non-compliance with the statute.

{¶ 28} Significantly, although R.C. 2933.83(C)(1) provides that the trial court must consider non-compliance with the provisions of the statute in adjudicating a motion to suppress eyewitness identification testimony, it does *not* provide that non-compliance, by itself, requires suppression of the testimony. In dictum, we have said that the "penalty" for failure to comply with the statute is not suppression, but the other remedies provided for in the statute. *State v. Stevenson*, 2d Dist. Montgomery No. 24821, 2012-Ohio-3396, ¶ 16, citing *State v. Ruff*, 1st Dist. Hamilton No. C-110250, 2012-Ohio-1910, which, at ¶ 7, holds that the statute "does not provide an independent ground for suppression[.]"

{¶ 29} We conclude that the failure of the police officers in this case to use blind administrators, as required by the statute, does not, by itself, require suppression of the evidence.

**{¶ 30}** The issue, then, is whether the identification procedure used was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification. *State v. Taylor*, 2d Dist. Montgomery No. 22232, 2008-Ohio-6048, ¶ 12, citing *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 374, 34 L.Ed.2d 401 (1972). Suppression also requires a finding that the identification was, in fact, unreliable under the totality of circumstances. *Id.* The trial court in the case before us concluded that Moon failed to clear the first of these hurdles by establishing that the identification procedure used in his case was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification. We agree.

**{¶ 31}** To begin with, the trial court found the testimony of the police officers at the suppression hearing to be "credible and believable." The trial court concluded that they did nothing, "by word or gesture," to suggest to the witnesses who the suspects were in the photo-spreads. In reaching this conclusion, the trial court was impressed, as we are, with the number of witnesses who were unable to identify any of the defendants, and the number who identified one, but not all, of the defendants. The trial court further noted that Rose dealt with the difficulty of Moon's hazel colored eyes "in an appropriate manner."

**{¶ 32}** Although the procedure used did not follow the statutory requirement of a blind administrator, it exceeded the requirements in other ways: the use of color photographs, the use of JusticeWeb, the conducting of all of the photo-spread identifications within the shortest time possible to avoid witnesses discussing their identifications with one another, and the officers' not telling the witnesses who made an identification that they had, in fact, identified the suspect. (The statute permits confirmation after the photo lineup is concluded.)

**{¶ 33}** The officers testified that once a witness failed to identify a suspect, that

failure was immediately accepted and documented in the officer's report. No pressure was put on the witness to continue to try to identify a suspect.

{¶ 34} Finally, the color photo-spread used to identify Moon is in our record. We have examined it. The filler photographs are quite similar to Moon in appearance. Moon's eye color does not stand out.

{¶ 35} We agree with the trial court. The procedure used in administering the photo-spread identifications in this case, while not in compliance with the statutory blind-administrator requirement, was not so impermissibly suggestive as to give rise to a substantial likelihood of misidentification. Like the trial court, we find it unnecessary to proceed to the second step of the analysis – whether the identifications were unreliable under the totality of the circumstances.

{¶ 36} Moon's First Assignment of Error is overruled.


## IV. Moon's Convictions Are Not Against the Manifest Weight of the Evidence

{¶ 37} Moon's Second Assignment of Error is as follows:

APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 38} Moon cites *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983), for the proposition that an appellate court, "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."

We have reviewed the entire trial transcript, and we conclude that this is not "the exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶ 39} Moon notes that the evidence linking him to the crimes consisted of the identification testimony of Dentel and Jones, and the forensic evidence linking Moon's DNA to a beer bottle recovered from a trash can outside Sanders's residence. Moon notes also that Dentel admitted to having consumed three beers, one shot of liquor, and eight lines of powder cocaine that night. Jones had consumed three or four beers before entering the boot joint, and continued drinking there.

{¶ 40} In disparaging Dentel's and Jones's testimony, Moon contends that their testimony is not worthy of belief because they were in conflict as to which perpetrator was backing up Sanders at gunpoint during the robbery. Dentel said that Simpson, the darkest-skinned of the three, shot Sanders; Jones said Moon backed Sanders up at gunpoint, although he could not see who shot Sanders. In our view, this difference in their testimony did not require the jury to disbelieve the testimony of both of them that Moon was one of the three participants in the robbery.

{¶ 41} Dentel testified that she had observed the three men for about an hour and a half before the robbery and shooting. She did not hesitate or waver in her identification. Although she testified that Simpson was the one who shot Sanders, it is not clear from the record that she saw Simpson backing Sanders up at gunpoint. Jones, who did testify that he saw Moon backing Sanders up at gunpoint, did not know who actually shot Sanders. And Annette Dillard testified that she saw Sanders backing up *after* he had been shot in the leg.

{¶ 42} Jones did not hesitate or waver in his identification of Moon as one of the

three men who participated in the robbery. He had met Michelle Carter, one of the murder victims, earlier that evening, and was attracted to her. When the two of them arrived at the boot joint, Jones escorted Carter, who had not been there previously, to the restroom. At that time, he had what he described as a good opportunity to see Moon's face, who was sitting with Simpson and Norvell near the restroom.

**{¶ 43}** Annette Dillard, who also testified, could not identify Moon as one of the three perpetrators. But she, like Dentel, testified that when the robbery began, all three of the young men who had been sitting together were actively participating, with guns drawn.

**{¶ 44}** Finally, there is the DNA evidence. Moon contends that it should be given little weight, since the beer bottle with his DNA was found in a trash can outside the Sanders residence, where anyone could have dumped it. But Dentel testified that the trash can was specific to the residence – it was not a group trash can into which trash from more than one residence was collected. And she also testified that the beer bottles from which the three perpetrators had been drinking were put in the trash container in the basement, which she described as small, "so it fills up real quick," and that the trash in that container was taken upstairs to be deposited in the outside trash can. The beer bottle with Moon's DNA was recovered from the outside trash can by the evidence technician, Ronald A. Christoffers, who responded to the crime scene that night. Under these circumstances, the jury could reasonably have found it unlikely that a bottle with Moon's DNA on it would have wound up in the trash can outside the residence, unless Moon was one of the perpetrators who had been drinking beer in the residence.

**{¶ 45}** Based upon our review of all of the evidence in the record, we conclude that

this is not the exceptional case in which the evidence weighs heavily against conviction, or that the jury lost its way.   Moon's Second Assignment of Error is overruled.


## V.   Conclusion

{¶ 46}   Both of Moon's assignments of error having been overruled, the judgment of the trial court is Affirmed.

. . . . . . . . . . . . .

FROELICH and HALL, JJ., concur.


Copies mailed to:

Mathias H. Heck
R. Lynn Nothstine
James S. Armstrong
Hon. Michael Tucker