[Cite as *State v. McShann*, 2019-Ohio-4481.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 27803 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-3361/1 |
| | : | |
| CURTIS M. MCSHANN | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 1st day of November, 2019.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by SARAH E. HUTNIK, Atty. Reg. No. 0095900, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

JOHN A. FISCHER, Atty. Reg. No. 0068346, 70 Birch Alley, Suite 240, Beavercreek, Ohio 45440
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Defendant-Appellant, Curtis M. McShann, appeals from his conviction and sentence, after a jury trial, on four counts of murder (merged to one count), one count of aggravated burglary, four counts of aggravated robbery (deadly weapon), four counts of felonious assault (deadly weapon), four counts of felonious assault (serious physical harm), one count of discharging a firearm at or into a habitation, and one count of discharge of a firearm on or near prohibited premises. All these counts had firearm specifications, and the jury found McShann guilty of the specifications as well.

{¶ 2} Following the jury verdict, the trial court heard evidence concerning repeat violent offender specifications, which had been attached to almost every count. In addition, the court, by agreement, considered three counts of having weapons under disability (prior offense of violence) and one count of having weapons under disability (prior drug conviction). All these counts also had firearm specifications. After finding McShann guilty of these charges and specifications, and merging a number of offenses, the court ultimately imposed both consecutive and concurrent sentences, for a total sentence of 60 years to life in prison.

{¶ 3} McShann's initial counsel filed a brief pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), indicating that he found no potential assignments of error having arguable merit. Our review of the record indicated otherwise, and we appointed new counsel for McShann. New counsel has raised three assignments of error.

{¶ 4} According to McShann, the trial court erred by failing to suppress identification testimony from the only witness who placed McShann at the scene of a

shootout.    Additionally, McShann contends that trial counsel rendered ineffective assistance by failing to file a motion to suppress identifications of McShann's fiancée and sister, or to object to this evidence at trial.   And finally, McShann maintains that the trial court erred by failing to require the State to identify a confidential informant.

{¶ 5} For the reasons that follow, all the assignments of error are without merit. Accordingly, the judgment of the trial court will be affirmed.


I.   Facts and Course of Proceedings

{¶ 6} The charges against McShann arose from a gunfight that took place on October 25, 2016.   As general background, during the afternoon and evening of that day, several people were having a get-together at Germel Hughes's home, which was located on Riverside Drive in Dayton, Ohio.   At some point after 11:00 p.m., most people at the party decided to go out to a bar, and several guests left to change clothes.   The people who left included James Mitchell, Letisa Gomez, Brittany Depp, Tyesha Auster, and Shahila Taylor.   Hughes and several people remained inside the house.

{¶ 7} Mitchell's van was parked directly in front of the house, and Mitchell went around the front of the van, where he saw two men on the driver's side of his van, crouched down, waiting.   These men each had machine guns (or long guns) and put the guns in his face.   According to the trial testimony, Mitchell recognized one man as "Curt" and the other as someone whose name he thought was Damarko (later identified, respectively, as Curtis McShann and Jamarko Walker).[1]   Mitchell knew Walker, as they

---

[1] Mitchell testified that he used the name "Damarko," while the police stated that Mitchell used the name "Demarko."   The actual individuals being referenced were Jamarko Walker and Jamarko McShann (the latter Curtis's brother).

used to date the same woman. Mitchell had also seen McShann before in the neighborhood, but did not know McShann's full name.

{¶ 8} Walker told Mitchell to get on the ground, and he complied. Mitchell was on his stomach, with his face towards the house. Walker had a machine gun and was pressing it in Mitchell's armpit while McShann stood nearby with a machine gun. Walker asked Mitchell questions like who was in the house, and McShann took items out of Mitchell's pockets, including his wallet, money, and keys. The wallet was distinctive, as it was a "Zombie Killers" wallet.

{¶ 9} While these events were occurring, Depp was on the other side of the van, wondering what was taking Mitchell so long. At that point, a tall thin man, dressed all in black and with his face covered, tapped Depp on the shoulder. The man held a bigger gun (not a long gun), and told Depp not to reach for anything. He then reached in Depp's pocket and took out her phone. After telling her not to move, he walked away. At that point, Depp heard a commotion and saw two other men dressed in black coming around the van. After hearing loud voices and shooting, Depp hit the ground and slid under the van.

{¶ 10} Gomez and Taylor were also at the van's passenger side when a man with a long gun walked up and told them to get down. This man took Gomez out to the street, and she laid down there, near the driver's side of the van. Gomez saw Mitchell next to the van and saw someone standing over him with a gun. One man had a gun trained on Gomez and one had a gun on Mitchell. The men told Gomez to give them what she had. However, while she was trying to get money out of her purse, the men said she was moving too much. As a result, Gomez threw her purse at them. During this time,

Gomez heard some yelling by the house and then heard some gunshots. And then it was as if "those gunshots triggered all the gunshots." At that point, Gomez ran and hid behind a silver Jeep that was parked across the street.

{¶ 11} Before the shooting started, Auster was by a gate in the yard, waiting for a ride. Someone put a handgun to her head and forced her to the passenger side of the van, where she was patted down and was told to get down on the ground. Nothing was taken from her because she did not have anything. Once Auster got on the ground, she heard gunshots and tried to get under the van. However, the van was too close to the ground, so she just "balled up" on the passenger side.

{¶ 12} As noted, Hughes and several other people had remained in the house. A tall man came into the house, pointed a gun at everyone, and told them to lay down. When the man tried to shoot his gun, however, it jammed and did not fire. Consequently, he walked back outside. Shots were then fired into the house and the people in the house started shooting back.

{¶ 13} Once the gunshots stopped, Mitchell saw McShann and Walker get into a car and leave. The get-away car was a gray four-door Chevy Impala, and the base and doors were different colors. Walker got into the front passenger's side door, while McShann got in the back passenger's door, and the car drove away. At that point, everyone in the house went outside. Several people had been shot, including Auster, who had been shot in the neck, Depp, who had bullets in her shoulder, chest, and lower back, and a third person who had been shot in the back while inside the house. Brandon Lanier, the man who had entered the house with the gun, was found on the opposite side of the street, dead of a gunshot wound.

{¶ 14} The initial dispatch about shots having been fired occurred at 11:38 p.m., and the police promptly arrived on the scene, where they found Lanier's body. They also found many shell casings both inside and outside the house. Outside, there were around 64 shell casings, including .762 rounds, 9-millimeter rounds, .45 rounds, and .40 caliber shell casings. Inside the house, the police recovered 11 .40 caliber casings, mostly in the living room. The walls and ceilings of the house, including those in the living room, bedroom, and kitchen also revealed a number of bullet holes and strikes. Additionally, Mitchell's van sustained considerable damage, including bullet holes and shattered windows.

{¶ 15} That night, the police spoke with numerous witnesses, including Mitchell. Mitchell gave the police names of potential suspects, including "Curt" and either Demarko or Jamarko, as the people who had the machine guns. Because the police knew that McShann had a brother named Jamarko, they prepared separate photo spreads for McShann and his brother and took them to Mitchell's home around 7:00 a.m. on October 26, 2016 (several hours after the gunfight). Mitchell's mother woke him up, and he selected Curtis McShann's picture, indicating that it "sort of looked" like the picture of McShann's brother, whom he had already identified with more certainty.

{¶ 16} The police had a cell phone number for McShann and pinged the phone to try and find him. Using this technique and call detail records from McShann's cell phone, the police located both McShann and Walker at the Middletown, Ohio, apartment of McShann's fiancée, LaJoyce Morris, at around 8:00 or 9:00 a.m. on October 26, 2016. McShann and Walker were then arrested and taken to the Dayton Safety Building. The only gun ever located was a 9-millimeter gun found in the apartment. Walker had the

Zombie Killer wallet, together with Mitchell's identification, in his possession.

{¶ 17} In November 2016, McShann was indicted on 24 counts, including those indicated above. In December 2016, McShann filed a motion to suppress, asking the court to suppress statements he made while in custody. He also alleged that the lineup procedures were unduly suggestive. After holding an evidentiary hearing, the trial court overruled the motion in March 2017.

{¶ 18} Following a five-day jury trial in August 2017, the jury found McShann guilty of all charged offenses, with the exception of one charge the State had dismissed. Shortly thereafter, the trial court heard evidence about the offenses that McShann had agreed to have tried to the court. In September 2017, the trial court filed a judgment entry finding McShann guilty of those charges as well (counts 21-24). In addition, the court found that McShann was a repeat violent offender with regard to counts 1-7 and 9-19.

{¶ 19} After holding a sentencing hearing on October 3, 2017, the court sentenced McShann to a total of 60 years to life in prison. McShann timely appealed from the trial court's judgment. As indicated, after McShann's appellate counsel filed an *Anders* brief, we rejected the *Anders* brief and appointed new counsel. *See State v McShann*, 2d Dist. Montgomery No. 27803 (Decision and Entry, Dec. 6, 2018).

## II. Eyewitness Identification

{¶ 20} McShann's First Assignment of Error states that:

The Trial Court Erred When It Failed to Suppress the Identification

of Mr. McShann by the Only Witness to Place Mr. McShann at the Scene of

the Shootout.

{¶ 21} Under this assignment of error, McShann first contends that the photo lineups were impermissibly suggestive because the police violated their own procedures and R.C. 2933.83 in administering the lineups. Specifically, the detective (Det. Roberts) who initially presented the photo lineup to James Mitchell failed to sign the lineup form and also failed to have Mitchell circle McShann's picture, which was allegedly required by departmental procedures. McShann further contends that Mitchell was groggy and sleep-deprived, and that the room was dark and cramped, thus making the identification improper.

{¶ 22} In overruling the motion to suppress, the trial court concluded that Det. Roberts's method of displaying the photo lineup to Mitchell complied with the explicit requirements of R.C. 2933.83(B). The court further held that Roberts did not suggest to Mitchell that the suspect was arrayed in the photos, nor did he suggest who Mitchell should pick from the array. Doc. #46, p. 4.

{¶ 23} Before beginning our discussion, we should note that standards for granting relief under *Anders* vary significantly from those used to evaluate a trial court's decision on a motion to suppress. Under *Anders*, we conduct an independent review of the record to decide if an appeal is "wholly frivolous." *Anders*, 386 U.S. at 744, 87 S.Ct. 1396, 18 L.Ed.2d 493. In contrast, appellate review of suppression motions "presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "Accepting these facts as true, the appellate court must then

independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*

{¶ 24} Furthermore, our review is limited to the evidence that was presented at the suppression hearing; we cannot consider the evidence presented at trial. *State v. VanNoy*, 188 Ohio App.3d 89, 2010-Ohio-2845, 934 N.E.2d 413, ¶ 7, fn. 1 (2d Dist.).

{¶ 25} Turning to the applicable law, "[d]ue process may require a court to suppress eyewitness testimony when the identification results from an unduly suggestive identification procedure." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 208, citing *Foster v. California*, 394 U.S. 440, 442, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). "It is the likelihood of misidentification which violates a defendant's right to due process * * *." *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

{¶ 26} "When a witness who identifies a defendant has been confronted with a live or photographic lineup of suspects, due process requires the court to suppress evidence of the witness's identification of the defendant if the court finds that (1) the confrontation was unduly suggestive of the defendant's guilt and (2) the witness's identification of the defendant was unreliable under the totality of the circumstances." *State v. Wilson*, 2d Dist. Montgomery No. 22624, 2009-Ohio-1038, ¶ 13, citing *State v. Waddy*, 63 Ohio St.3d 424, 588 N.E.2d 819 (1992) and *State v. Murphy*, 91 Ohio St.3d 516, 747 N.E.2d 765 (2001). "A lineup is unduly suggestive if it steers the witness to one suspect, independent of the witness's honest recollection." (Citations omitted.) *Adams* at ¶ 208.

{¶ 27} In his brief, McShann concedes that he is not challenging the suggestiveness of the photos in the lineup. Instead, his objection is to the procedures

used.   Appellant's Reply Brief, pp. 1-2.   After reviewing the record, we find nothing unduly suggestive about the procedures that Det. Roberts used.

{¶ 28} R.C. 2933.83, which was enacted in 2010, provides minimum requirements for live lineup and photo lineup procedures.   Under the statute, a "blind administrator" is defined to mean that "the administrator does not know the identity of the suspect."   R.C. 2933.83(A)(2).

{¶ 29} In this case, there is no evidence that Det. Roberts knew McShann's identity.   Contrary to McShann's contention, Roberts did not have prior knowledge of the case that would prevent him from serving as a blind administrator.   Roberts had participated in some preliminary investigation, including interviewing some witnesses at the hospital.   However, he did not know names of potential suspects at that time, nor did he have other information about any potential suspect in the case other than a description of the individual who had been killed by gunfire.   Transcript of Proceedings, Vol. I pp. 104-110.[2]   Since this individual was already deceased, information about his description was irrelevant to the photo lineup.

{¶ 30} R.C. 2933.83(B) also provides that law enforcement agencies shall adopt specific procedures, which, at a minimum, must impose the following requirements:

>   (1) Unless impracticable, a blind or blinded administrator shall conduct the live lineup or photo lineup.

>   (2) When it is impracticable for a blind administrator to conduct the live lineup or photo lineup, the administrator shall state in writing the reason

---

[2] There were six volumes of transcripts of the trial court proceedings.   From now on, we will refer only to the volume numbers, i.e., "Vol."   Notably, only one volume had page numbers.

for that impracticability.

(3) When it is impracticable for either a blind or blinded administrator to conduct the live lineup or photo lineup, the administrator shall state in writing the reason for that impracticability.

(4) The administrator conducting the lineup shall make a written record that includes all of the following information:

(a) All identification and nonidentification results obtained during the lineup, signed by the eyewitnesses, including the eyewitnesses' confidence statements made immediately at the time of the identification;

(b) The names of all persons present at the lineup;

(c) The date and time of the lineup;

(d) Any eyewitness identification of one or more fillers in the lineup;

(e) The names of the lineup members and other relevant identifying information, and the sources of all photographs or persons used in the lineup.

(5) If a blind administrator is conducting the live lineup or the photo lineup, the administrator shall inform the eyewitness that the suspect may or may not be in the lineup and that the administrator does not know who the suspect is.

{¶ 31} The following testimony was elicited at the suppression hearing about the photo lineup. During investigation of the crime, Det. Daugherty developed the name of Curtis McShann as a suspect. He also had information about a suspect named "Jamarko." Because McShann had a brother named Jamarko, Daugherty asked Dayton

Police Detective Chad Jones to make up photo spreads for both Curtis and his brother, Jamarko. As pertinent to Curtis, Jones found McShann's picture on JusticeWeb and created a photo spread. Jones used the default search system and chose the most like and similar photos he could, based on hair, skin tone, and facial tattoos. Jones then gave the photo spread to Daugherty, who asked Roberts to act as a blind administrator and show the photo spread to Mitchell.

{¶ 32} Around 7:00 a.m. on October 26, 2016 (about seven hours after the gunfight), Jones drove Roberts to Mitchell's home to meet with Mitchell. When they arrived, Jones stayed in the car. Roberts walked up to the side door of the house and knocked. When Mitchell's mother answered, Roberts realized that he had woken her up. Mitchell's mother said that Mitchell was asleep. After she woke Mitchell up, Roberts met with Mitchell in the kitchen. No one else was present. Roberts showed Mitchell a photo array that included McShann's brother, and Mitchell picked number 5, stating "Looks like him, pretty sure." Vol. I at p.115.

{¶ 33} Roberts then showed Mitchell the second photo spread, which contained a picture of McShann. The time was around 7:13 a.m. At the suppression hearing, the following exchange occurred:

> Q. Okay. And when you laid that down in front of him did you keep that, what you're referring to of page 2 of 2, in front of you.
>
> A. Yes, I did.
>
> Q. When you laid the six-pack down in front of Mr. Mitchell, what happened at that time, sir?
>
> A. He said number 2 looks sort of like the other guy and I put an X

in line number 2 and wrote, sort of – looks sort of like the other guy.

Q. Okay. And what's the next thing that happened?

A. Then I would have taken the witness confidence statement and again, I recognize the person in folder or photo number, paused, he said 2, I wrote number 2 in there as the person who, tell me what they did. He says sort of looks like the other guy.

Q. Now did he sign that page indicating that he verified photo number 2 looked like the other guy.

* * *

A. He did – he did sign it in front of me, yes.

Q. I don't see however your signature on it.

A. I did not sign it. No, I did not.

Q. And what is the reason for that, detective?

A. I – I don't really have a reason. Just error on my behalf.

* * *

Q. But so the record is clear, you did witness Mr. Mitchell sign that particular page indicating the person he recognizes in photo number 2 as the person who sort of looks like the other guy.

A. Yes.

Q. Now I wanted to ask you, did you go back to the six-pack then and request that Mr. Mitchell circle photograph number 2 as the one he selected?

A. I did not.

    Q. Okay. And why is that?

    A. Again that was an error on my behalf that morning.

Vol. I at pp. 119-120.

{¶ 34} After finishing the photospread process, Roberts returned the folder containing the photospread to Detective Daugherty. The next day, Daugherty discovered the errors and instructed Roberts to re-contact Mitchell and finish the paperwork. Roberts stopped by Mitchell's home twice that day, but was not able to locate him during normal business hours. Vol. I at pp. 61 and 112. Instead of having Roberts continue to follow up, Daugherty took steps to rectify the situation. He was hanging around in the evening of October 27, 2016, trying to get the case together for the prosecutor, and located Mitchell in his home at around 4:30 or 5:00 p.m. that evening. *Id.* at p. 61. After arriving at Mitchell's house, Daugherty knocked on the door, but no one answered. However, as Daugherty walked back to his car, Mitchell pulled up.

{¶ 35} Daugherty met with Mitchell behind his car, showed him the photo spread, and explained that Roberts had failed to have Mitchell circle the photo. *Id.* at pp. 61-62. Mitchell acknowledged that he had selected photo number two. *Id.* at p. 62. Daugherty then told Mitchell that he needed to circle that part and initial it. *Id.* Contrary to what Mitchell had said previously, Mitchell now said that was definitely Curtis McShann. *Id.* According to Daugherty, Mitchell "mentioned about * * * him not being as sleepy and * * * [it was] light outside and he said he was shown this in his kitchen where it was * * * a little bit darker." *Id.* At the suppression hearing, Roberts said that when he showed the photospread to Mitchell in the kitchen, there were lights on, although it was not lit up like daytime. *Id.* at p. 126. It was light enough to see. *Id.*

{¶ 36} The above testimony does not indicate a violation of the requirements in R.C. 2933.83(B), as the statute does not mention having an officer sign the verification page, nor does it state that the identified photo must be circled. There is some evidence that the Dayton Police Department does require such procedures, since Roberts indicated he erred in failing to do these things. However, no procedures were admitted into evidence at the hearing. While Det. Daugherty technically inserted himself into the process by taking the photo lineup back to Mitchell's house, Daugherty did not do anything suggestive; he merely performed the clerical task of asking Mitchell to circle the photo that Mitchell had admittedly already selected.

{¶ 37} Furthermore, while McShann argues that Daugherty violated R.C. 2933.83(B)(2) and (3) by failing to document the reasons for failing to have a blind administrator conduct the lineup, we do not view Daugherty's actions as akin to those of administering a lineup. He was simply performing a clerical task of having Mitchell document what had already been done by a blind administrator.

{¶ 38} In responding to McShann's argument, the State contends that no violation occurred because Det. Roberts complied with the minimum requirements in R.C. 2933.83(B). Specifically, while the photo that Mitchell chose was not marked with a circle, it was marked with an X, and therefore complied with the requirement of identification in some form. *See* Appellees' Brief, pp. 12-13. We disagree, at least to the extent that R.C. 2933.83(C)(1) applies.

{¶ 39} Specifically, R.C. 2933.83(C)(1) requires trial courts, when adjudicating motions to suppress, to consider "[e]vidence of a failure to comply with any of the provisions of this section or *with any procedure for conducting lineups that has been*

*adopted by a law enforcement agency or criminal justice agency pursuant to division (B) of this section * * *."* (Emphasis added.) While the record of the hearing on the motion to suppress fails to include the specific procedures that the Dayton Police Department adopted, the police officers clearly believed that Det. Roberts did not comply with a requirement to have the photo of the identified party circled.

{¶ 40} Notably, even if a violation occurred, violations of R.C. 2933.83 are not independent grounds for suppression. *State v. Harmon*, 2017-Ohio-8106, 98 N.E.3d 1238, ¶ 23 (2d Dist.), citing State v. Stevenson, 2d Dist. Montgomery No. 24821, 2012-Ohio-3396, ¶ 16 (which agreed with *State v. Ruff*, 1st Dist. Hamilton No. C-110250, 2012-Ohio-1910, ¶ 7). In similar circumstances, we have held that "the procedure used in administering the photospread * * *, while not in compliance with R.C. 2933.83, was 'not so impermissibly suggestive as to give rise to a substantial likelihood of misidentification' and that, accordingly, we need not proceed to the second step of the analysis, namely 'whether the identifications were unreliable under the totality of the circumstances.' " *Harmon* at ¶ 31, quoting *State v. Moon*, 2d Dist. Montgomery No. 25061, 2013-Ohio-395, ¶ 35.

{¶ 41} In *Harmon*, the police had arranged for a blind administrator to conduct a photo lineup, but the detective who created the photo spread accompanied the administrator into the victim's hospital room. After the victim had pointed to a suspect, the detective asked if the photo showed " ' the individual that was in her house and that had shot her.' " *Id.* at ¶ 27. The detective was also aware of the suspect's identify. *Id.* at ¶ 28. While this insertion of the detective into the process did not comply with R.C. 2933.83, we found it was not impermissibly suggestive. *Id.* at ¶ 31.

{¶ 42} In *Moon*, the police procedure also did not comply with R.C. 2933.83, and the "impracticability of using a blind administrator was not documented." *Moon* at ¶ 2. Nonetheless, we found nothing in the procedure that was "so impermissibly suggestive as to give rise to a substantial likelihood of misidentification." *Id.* at ¶ 35.

{¶ 43} The deviation in the case before us is more attenuated than those in *Harmon* and *Moon*, and there is nothing to indicate that the conduct of either Det. Roberts or Det. Daugherty was impermissibly suggestive. We disagree with McShann that the difference in the degree of positivity of Mitchell's identification was due to anything that Daugherty said. Mitchell circled the photo he had already identified and indicated that he was positive this was the person. Mitchell's comment was made before Daugherty said anything other than indicating that Mitchell needed to circle and initial the photo he had identified. Vol. I at pp. 62-63. Only after this statement was made did Daugherty ask Mitchell about his prior identification. *Id.* at p. 63. At that time, Mitchell indicated that he was not as sleepy and the light was better. *Id.* We see nothing suggestive about what happened. Furthermore, we have reviewed the photo spread and find nothing remotely suggestive about the photographs.

{¶ 44} In light of the above discussion, we need not consider the second step – "whether the identifications were unreliable under the totality of the circumstances." *Moon*, 2d Dist. Montgomery No. 25061, 2013-Ohio-395, at ¶ 35; *Harmon*, 2017-Ohio-8106, 98 N.E.3d 1238, at ¶ 31.

{¶ 45} McShann's next argument is that even if the failure to follow police procedures did not amount to a due process violation, the trial court erred in failing to give a proper jury instruction under R.C. 2933.83(C)(3). This part of the statute provides that:

When evidence of a failure to comply with any of the provisions of this section, or with any procedure for conducting lineups that has been adopted by a law enforcement agency or criminal justice agency pursuant to division (B) of this section and that conforms to any provision of divisions (B)(1) to (5) of this section, is presented at trial, the jury shall be instructed that it may consider credible evidence of noncompliance in determining the reliability of any eyewitness identification resulting from or related to the lineup.

{¶ 46} The defense did not raise this issue at trial, and did not request such a jury instruction.   *See* Vol. V, pp. 940-963.   We, therefore, review only for plain error.   *State v. Young*, 2017-Ohio-9028, 101 N.E.3d 1056, ¶ 33 (failure to object to jury instructions allows review only for plain error).   "An alleged error is plain error only if the error is 'obvious,' * * * and 'but for the error, the outcome of the trial clearly would have been otherwise.' "   *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 181, quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus.   (Other citation omitted.)   "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice."   *Long* at paragraph three of the syllabus.

{¶ 47} After reviewing the record, including McShann's video-taped statements to the police, we conclude that this case does not present exceptional circumstances warranting relief under the plain error doctrine.   While it is true that Mitchell was the only eyewitness to identify McShann, substantial circumstantial evidence also linked McShann to the crimes.   As a result, we cannot conclude that, but for the error, the outcome of the

trial would have been different.

{¶ 48} Under Ohio law, "a defendant may be convicted solely on the basis of circumstantial evidence." *State v. Nicely*, 39 Ohio St.3d 147, 151, 529 N.E.2d 1236 (1988). " '[P]roof of guilt may be made by circumstantial evidence as well as by real evidence and direct or testimonial evidence, or any combination of these three classes of evidence. All three classes have equal probative value, and circumstantial evidence has no less value than the others.' " *Id.*, quoting *State v. Griffin*, 13 Ohio App.3d 376, 377, 469 N.E.2d 1329 (1st Dist.1979). "In some instances certain facts can only be established by circumstantial evidence." *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991).

{¶ 49} By referring to circumstantial evidence, we are not discounting either the fact that eyewitness testimony implicated McShann, or the fact that the jury was entitled to believe Mitchell. Nonetheless, Mitchell's identification was not the only evidence.

{¶ 50} During the initial investigation of the crime, the police were able to obtain a cell phone number for McShann. By pinging that number, they pinpointed a location in Middletown, Ohio, and were able to make contact at an apartment between 8:00 and 9:00 a.m. on October 26, 2016 (about eight hours after the gunfight). Vol. IV at p. 737; Vol. V at pp. 860-861. After the police arrived, they banged on the door and announced that it was the police. However, a several-minute delay elapsed before McShann's fiancée, LaJoyce Morris, came to the door. Vol. V. at p. 863. No one was present in any of the living areas; instead, McShann and Walker were eventually found together in the bathroom. The bathroom door had also been closed. Vol. IV at p. 739. The delay in answering the door and the fact that McCann hid in the bathroom was circumstantial

evidence of guilt.

{¶ 51} Walker also had the Zombie Killers wallet in his possession, with Mitchell's identification inside. Vol. IV at pp. 741-42. According to Mitchell, McShann had taken the wallet from him during the robbery. Vol. III at pp. 443 and 512-513. The police also found a 9 millimeter semi-automatic handgun, with an empty magazine inserted, on the couch in the apartment where McShann was arrested. Vol. IV at pp. 745-746 and 750-751. Thirteen of the 9-millimeter casings recovered from the scene were matched to the firearm recovered from the apartment. Vol. IV at pp. 812-815; Vol. V at p. 912.

{¶ 52} Once McShann was taken in for questioning, he denied being present at the crime scene and gave the police alternate locations where he had been at the time of the gunfight. His alleged locations were inconsistent with other evidence, including the testimony of his fiancée, and were on the other side of the city from where expert testimony placed his cell phone at the time of gunfight, i.e., his cell phone was in the area of the crime. However, McShann also told the police that he had his cell phone with him that night. Vol. III at pp. 604-605; Vol. IV. at pp. 719-726; Vol. V at pp. 878-881 and 882-883; and Ex. 176. Again, McShann's inconsistent statements to the police were circumstantial evidence of guilt.

{¶ 53} Finally, the car described as having been used in the crimes was a four-door gray Impala with mismatched-colored doors. Vol. III at pp. 450-451. According to McShann's fiancée, McShann drove a Chevy Impala from around January 2016 to June 2016. Id. at pp. 612-613. In September 2016, McShann sold an Impala to his sister, Corinthia McShann, for $1,500. Vol. V at pp. 885-887. McShann did drive the car after that, but told the police he had not driven it for a few days before the gunfight because it

was "too hot." *Id.* at 885.

{¶ 54} Although the police talked to McShann's sister and also looked in other locations, they were not able to locate the Impala. *Id.* However, in May 2017, the police found the car at an address on Little Richmond Road in Dayton, Ohio and verified that the VIN number was the same as the one for the car that McShann's sister owned (and for which the police had been searching). *Id.* at pp. 886-889, 892, and 921.

{¶ 55} Jeremy Macher, who occupied the Little Richmond Road property and did auto body repair, testified that he found a gray Impala automobile in the driveway of his property in November 2016. Macher had received a phone call about a week earlier, but did not expect a car to appear. Vol. IV at pp. 761-763. The Impala had a blue bumper and a black door that was a different color from the rest of the car. *Id.* at p. 764. A few days later, a woman (subsequently identified as LaJoyce Morris) came over and asked Macher to fix the car and paint it one consistent color. *Id.* at pp. 765-766, 779, and Ex. 204; Vol. V at p. 894. Morris gave Macher $600 of the estimated $2,000 cost, and then returned in February 2017, when she gave him another $400. Vol. IV at pp. 766-767. At that time, Morris said that she wanted to get the car done in memory of her husband, who had been killed. *Id.* at p. 770. By then, Macher had fixed the car and had painted it a factory greenish-gray color. *Id.* at pp. 770-771. Around March 2017, Morris came back a third time with another woman (later identified as Corinthia McShann), but they did not give him any more money. *Id.* at pp. 771, 786-787, 779 and Ex. 203; Vol. V at p. 894.

{¶ 56} Although McShann was in jail when these latter events occurred, they provide evidence of an attempt to conceal evidence and disassociate McShann from any

connection to the car involved in the crimes.

{¶ 57} In view of the above discussion, there is no basis for applying the plain error doctrine.

{¶ 58} McShann's final argument in this context is that trial counsel rendered ineffective assistance of counsel: (1) by failing to object to or correct his identification by Mitchell; and (2) by failing to request a jury instruction under R.C. 2933.83(C)(3).

{¶ 59} "To prove an allegation of ineffective assistance of counsel, a defendant must satisfy a two-prong test."  *Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 206, citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  "First, the defendant must establish that counsel's performance fell below an objective standard of reasonable representation." * * * And second, the defendant must show that he or she was prejudiced by the deficient performance."  *Id*. "A defendant establishes prejudice by showing that but for counsel's errors, the result of the trial would have been different."  *Id.*, citing *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph three of the syllabus.

{¶ 60} We have already concluded that the lineup procedure was not suggestive. While Det. Roberts failed to have Mitchell circle McShann's photo, this was not a significant violation.   Furthermore, even if trial counsel's performance had been deficient, there is no way to conclude that the outcome of the trial would have been different.   There was simply no evidence to support the contention that McShann was not involved in the incident.   Tracking of McShann's cell phone (which by his own admission to the police was with him all night) placed him at the crime scene at the relevant time period.   The car that was described to have been involved also matched the description of his sister's

car. In addition, when McShann and the other charged defendant, Jamarko Walker, were arrested, a victim's wallet and identification and a gun used in the gunfight were in the apartment. Finally, there was no evidence to support McShann's alleged alibi, other than his own discredited statements to the police.

**{¶ 61}** Accordingly, the First Assignment of Error is overruled.

### III. Failure to Move to Suppress or Object to Identification

**{¶ 62}** McShann's Second Assignment of Error states that:

Mr. McShann's Trial Counsel Was Ineffective for Failing to Move to Suppress or Object to the Identifications of Mr. McShann's Fiancée and Sister by the Auto Restoration Mechanic.

**{¶ 63}** Under this assignment of error, McShann contends that his trial counsel was ineffective because he failed to file a motion to suppress or to object to testimony about the identification of photos of LaJoyce Morris and Corinthia McShann by Macher. According to McShann, Det. Daugherty again improperly injected himself into a "photo lineup" by showing Macher pictures of Morris and Corinthia.

**{¶ 64}** As indicated, to establish ineffective assistance of counsel, there must be both performance of counsel that falls below an objective standard of reasonable representation, and prejudice to the defendant, which is illustrated by the fact that, absent counsel's errors, the trial's outcome would have been different. *Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, at ¶ 206.

**{¶ 65}** McShann's motion to suppress was filed in December 2016, shortly after the indictment was filed, and before police learned of the Chevy Impala's location. In

February 2017, the defense acknowledged receipt of discovery materials in the case. *See* Doc. #41. The trial court then denied the motion to suppress in mid-March 2017, also before the police learned of the Impala's location. In April 2017, the court set the case for a jury trial to begin on August 21, 2017. *See* Doc. #50.

{¶ 66} Around May 17, 2017, a confidential informant told Det. Daugherty where a car used in the homicide could be located. Vol. V at pp. 916-917. As noted, during his investigation of that tip, Daugherty showed Macher pictures of Morris and Corinthia, and asked if they were the women who came to Macher's property in connection with the car repairs.

{¶ 67} Subsequently, on August 1, 2017, the defense filed another acknowledgement of receipt of discovery, which included a DVD of the stolen car and Daugherty's supplemental report for the period between May 17, 2017 and June 12, 2017. *See* Doc. #95. Thereafter, McShann did not file a motion to suppress. However, he did file a motion seeking the identity of the confidential informant. *See* Doc. #112 (filed on August 15, 2017). The court stated at the final pretrial that it would issue a decision on the motion; the court then later denied the motion. Vol. I at p. 140; Doc. #154 (filed on September 14, 2017).

{¶ 68} The record does not indicate that defense counsel knew before trial that Det. Daugherty had shown photos to Macher. Therefore, there would be no basis upon which to conclude that trial counsel should have filed a motion to suppress. Moreover, we find no deviation from objective standards of reasonable representation in connection with counsel's failure to object to testimony about the photos.

{¶ 69} R.C. 2933.83(A)(8) defines a photo lineup as "an identification procedure in

which an array of photographs, including a photograph of the suspected perpetrator of an offense and additional photographs of other persons not suspected of the offense, is displayed to an eyewitness for the purpose of determining whether the eyewitness identifies the suspect as the perpetrator of the offense."

{¶ 70} Courts have held that where only one photo is shown, R.C. 2933.83 does not apply. *State v. Lennon*, 8th Dist. Cuyahoga No. 104344, 2017-Ohio-2753, ¶ 53, citing *State v. Miller*, 11th Dist. Lake No. 2011-L-111, 2012-Ohio-3515, ¶ 37; *State v. Glenn-Coulverson*, 2017-Ohio-2671, 90 N.E.3d 243, ¶ 54 (10th Dist.). In that situation, the issue is whether a defendant's due process rights were violated due to the procedure used for identification. *Lennon* at ¶ 54. As noted, "[d]ue process may require a court to suppress eyewitness testimony when the identification results from an unduly suggestive identification procedure." *Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, at ¶ 208, citing *Foster*, 394 U.S. at 442, 89 S.Ct. 1127, 22 L.Ed.2d 402.

{¶ 71} However, in the case before us, Daugherty did not display a photo to Macher for purposes of identifying McShann as the perpetrator of the offenses that occurred on October 25, 2016. There was no indication that Macher had ever seen McShann. Instead, Daugherty showed the photo in a purely investigative role, to see if Morris and Corinthia were the persons who were connected to the car. McShann, therefore, had no due process rights to assert with regard to this transaction. "[A] party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.' " *Kowalski v. Tesmer*, 543 U.S. 125, 129, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004), quoting *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). *Accord N. Canton v. Canton*, 114 Ohio St.3d 253,

2007-Ohio-4005, 871 N.E.2d 586, ¶ 14.

{¶ 72} In certain instances, third parties have been allowed such standing, but two additional showings are required: (1) the party asserting the right must have a "close relationship" with the person possessing the right; and (2) there must be a hindrance to the ability of the possessor to assert the right. *Kowalski* at 130. An example of a close relationship would be an existing attorney-client relationship. *Id.* at 130-131.

{¶ 73} Here, the required factors are absent. While Morris was McShann's fiancée and Corinthia was his sister, thee are not the types of close relationships that are needed. Furthermore, Morris and Corinthia can assert their due process rights should the State decide to charge them with tampering with evidence.

{¶ 74} For an example of a situation where third-party standing was rejected, *see United States v. Payner*, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980). In *Payner*, the U.S. government, acting through an agent of the Internal Revenue Service, unlawfully seized a banker's briefcase while he was at dinner with a female private investigator. During the dinner, another private investigator entered the woman's apartment, took the briefcase, and delivered it to an IRS agent. The agent then copied 400 documents and the briefcase was returned to the apartment. These documents eventually led to discovery of a loan guarantee agreement, which was the only proof that the defendant had falsified his tax return. *Id.* at 729. Despite the fact that the search was clearly illegal, the United States Supreme Court noted that its "Fourth Amendment decisions have established beyond any doubt that the interest in deterring illegal searches does not justify the exclusion of tainted evidence at the instance of a party who was not the victim of the challenged practices." (Citations omitted.) *Id.* at 735.

{¶ 75} Because McShann was not entitled to object to photos presented by Det. Daugherty to Macher, the performance by McShann's trial counsel did not fall below an objective standard of reasonable representation. As a result, the Second Assignment of Error is without merit and is overruled.

## IV. Confidential Informant

{¶ 76} McShann's Third Assignment of Error states that:

The Trial Court Erred When It Failed to Require the State to Identify

the Informant Who Tipped Police to the Location of the Get-Away Car.

{¶ 77} Under this assignment of error, McShann contends that the trial court erred in refusing to disclose the identity of the confidential informant who alerted the police to the location of the car that was involved in the crimes. In refusing to allow disclosure, the trial court concluded that McShann failed to show that the identity of the informant was vital to the defense or would even be beneficial. Doc. #154, p. 1.

{¶ 78} "The identity of an informant must be revealed to a criminal defendant when the testimony of the informant is vital to establishing an element of the crime or would be helpful or beneficial to the accused in preparing or making a defense to criminal charges." *State v. Williams*, 4 Ohio St.3d 74, 446 N.E.2d 779 (1983), syllabus. In situations where "the defendant has not attempted to subpoena by name an individual he believes served as a confidential informant, but rather has merely requested the disclosure of the name of the informant, * * * the burden is on the defendant to show that the need for the testimony of the informant outweighs the government's interest in keeping the identity of the informant secret." *State v. Brown*, 64 Ohio St.3d 649, 653, 597 N.E.2d 510 (1992).

{¶ 79} In arguing that he had a right to know the informant's identity, McShann points to the fact that someone else was driving the car that night since he was seen getting in the back seat and Walker was seen getting in the front passenger seat. McShann contends that whether the informant was the driver or how the informant was connected to the car would be useful to the defense. However, he fails to point out how this information would assist.

{¶ 80} Since McShann was a passenger in the car when it left the crime scene, he would have known the identity of the driver and could have subpoenaed that person to testify. He failed to do so. In addition, we see no possible scenario in which knowing the identity of the person who tipped off the police would have aided the defense.

{¶ 81} Finally, death threats were made to Mitchell's family prior to trial, to the extent that Mitchell signed a notarized paper in April 2017, stating that he could not 100% identify McShann and would not be testifying at trial. *See* Vol. III at pp. 476-479 and Ex. 179. After McShann signed the affidavit, the threats stopped. *Id.* at p. 479. Under the circumstances, the identity of the confidential informant was properly protected.

{¶ 82} Accordingly, the Third Assignment of Error is overruled.

## V. Conclusion

{¶ 83} All of McShann's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FROELICH, J. and HALL, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Sarah E. Hutnik
John A. Fischer
Curtis M. McShann
Hon. Richard Skelton