[Cite as *State v. Dewberry*, 2020-Ohio-691.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 27434 |
| | : | |
| v. | : | Trial Court Case No. 2015-CR-2994 |
| | : | |
| GEORGE L. DEWBERRY, SR. | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 28th day of February, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by SARAH E. HUTNIK, Atty. Reg. No. 0095900, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

LUCAS W. WILDER, Atty. Reg. No. 0074057, P.O. Box 574, Dayton, Ohio 45409
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} George L. Dewberry, Sr., was found guilty after a jury trial in the Montgomery County Court of Common Pleas of aggravated murder, murder, 2 counts of felonious assault, attempted murder, and having weapons while under disability, along with numerous firearm specifications. After merging several charges and specifications, the trial court sentenced Dewberry to an aggregate term of life without parole plus 20 years in prison. For the following reasons, the trial court's judgment will be affirmed.

## I. Factual and Procedural History

{¶ 2} Shortly before midnight on August 20, 2015, Jesse Pierce and his girlfriend, Laura Castro, were shot multiple times while seated in Castro's vehicle. Pierce, seated in the driver's seat, died from his injuries at the scene. Castro, seated in the front passenger seat, was shot twice in the face, but survived her injuries. An extensive police investigation ensued.

{¶ 3} On the morning of the shooting, Detective William Geiger went to the hospital and met with Castro, who could communicate in writing. Castro did not identify her shooter at that time. By August 25, the police had identified Dewberry as a suspect. Castro then was shown a photographic lineup containing Dewberry's photo, but she did not identify anyone as the shooter. After Castro was released from the hospital, she left the Dayton area and decided to contact the police about the shooting. In September 2015, Castro met with Detective Brad Daugherty and showed him a photograph from Facebook of the person who shot her; the photo was of Dewberry. Subsequently, on September 25, Castro was shown another photographic lineup, which contained the same individuals as the prior lineup but in a different order. Castro identified Dewberry as the shooter and indicated that she was 100 percent positive of her identification.

{¶ 4} The police spoke with Dewberry prior to Castro's identification. On September 8, Detective Daugherty and Detective Tom Cope went to Dewberry's residence and spoke with Dewberry on his back patio. The conversation was recorded. On September 22, after Castro identified Dewberry as the shooter based on the Facebook photo, Daugherty obtained and executed a search warrant for Dewberry's residence.[1] Just prior to executing the search warrant, the police arrested Dewberry outside his home. Dewberry requested an attorney at the police station, so no interview occurred. However, as he was being taken to the jail, Dewberry repeatedly asked what Castro was saying, and he made a comment to the officers that "you'll never get her [Castro] on the stand to testify against me." Dewberry also made another comment as he passed by television cameras.

{¶ 5} On October 1, 2015, Dewberry was indicted for aggravated murder (prior calculation/design), attempted murder, felonious assault (deadly weapon), felonious assault (serious physical harm), murder, and having weapons while under disability. All of the charges, except for the charge of having weapons while under disability, included a firearm specification.

{¶ 6} Dewberry subsequently moved to suppress statements he made and any evidence obtained as a result of the search of his residence and of his warrantless arrest. He separately filed a motion to suppress the photospread identification by Castro. The

---

[1] The search warrant was admitted at the suppression hearing as State's Exhibit 3. After the trial court's suppression decision and upon the State's motion, the State's suppression hearing exhibits were returned to the State in anticipation of their use at trial. The search warrant was not offered or admitted at trial nor was it otherwise resubmitted to the trial court, and it is not part of the record.

court held a hearing on the statements and the search warrant issues on March 18, 2016, and a separate hearing on the photospread identification on March 29, 2016.

{¶ 7} At the beginning of the first hearing on March 18, the court addressed whether Dewberry would be able to call the witness who made an identification (Castro); the court stated, "unless I determine a certain way, the complaining witness will not be required to come here for the motion to suppress." At the end of the first hearing, the court stated that the hearing on the identification would occur on March 29 and that "if, in fact, based upon the law in Ohio, I felt that the witness who identified the defendant in the photospread needed to be brought in, that would be after that. That would clearly continue the hearing. But I could probably make that decision on that date * * *." (Tr. at 44-45.) On March 29, the court heard from four police officers regarding the photospread identifications.

{¶ 8} At defense counsel's request, the trial court permitted the parties to file simultaneous post-hearing memoranda by April 8 on whether it would be appropriate for defense counsel call the witness who made the photospread identifications. Both parties filed memoranda on April 8, focusing primarily on whether the procedures were unduly suggestive. Defense counsel asked the court to suppress Castro's identification or, alternatively, to require Castro to give testimony at a later suppression hearing regarding the photospread process and her identification of Dewberry. The State asked the court to overrule the motion to suppress because the procedures were not unduly suggestive. The State indicated that, if the court were to find something unduly suggestive, then the State would request a hearing regarding the reliability of the identification, at which time the State would anticipate calling Castro to testify.

{¶ 9} On April 18, 2016, the trial court overruled Dewberry's motions in their entirety, including Dewberry's request to call Castro as a suppression hearing witness.

{¶ 10} The court conducted a jury trial over several days in January 2017. The jury convicted Dewberry of all counts and specifications. After merging some of the charges and firearm specifications, the trial court sentenced Dewberry to a mandatory term of life in prison without parole for the aggravated murder, 11 years in prison for attempted murder, and 36 months in prison for having weapons while under disability, all of which were to be served consecutively to each other. The court also imposed an additional 3 years each for two firearm specifications. As stated above, Dewberry's aggregate sentence was life without parole plus 20 years in prison.

{¶ 11} Dewberry's original appellate counsel filed a brief pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967). Upon an initial review, we found that non-frivolous issues existed. We rejected the *Anders* brief and appointed new counsel for Dewberry. Dewberry now raises seven assignments of error, which we will address in an order that facilitates our analysis.

## II. Sufficiency and Manifest Weight of the Evidence

{¶ 12} Dewberry's second assignment of error claims that his convictions were based on insufficient evidence and against the manifest weight of the evidence.

{¶ 13} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The relevant inquiry is whether any rational finder of fact, after

viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

{¶ 14} In contrast, when reviewing an argument challenging the weight of the evidence, an appellate court may not substitute its view for that of the trier of fact, but reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 15} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 16} In reviewing challenges based on the sufficiency and/or manifest weight of the evidence, we are required to consider all of the evidence admitted at trial, regardless of whether it was admitted erroneously. *State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284; *State v. Rosales*, 2d Dist. Montgomery No. 27117, 2018-Ohio-

197, ¶ 16, citing *State v. Johnson*, 2015-Ohio-5491, 55 N.E.3d 648, ¶ 95 (2d Dist.).

{¶ 17} The State's evidence at trial established the following facts.

{¶ 18} Shortly before midnight on August 20, 2015, Pierce and his girlfriend, Castro, were shot while seated in Castro's vehicle on Vina Villa Avenue in Dayton. Pierce, who was in the driver's seat, was shot eight times; six of those shots were "in a line coming from the right temple, down the right neck to the right back" and were likely fired in quick succession. Pierce was also shot above his right eyebrow and on the top of his head. Unburned gunpowder particles were found near the entrance wounds to his eyebrow and scalp, indicating that the shooter was within six inches of Pierce. Pierce died from his injuries. Castro, who was in the front passenger seat, was shot twice in the face; her right cheekbone was fractured, her lower left jaw was fractured and shattered, and she lost several teeth. One bullet went through her thumb and into her cell phone, which she was holding when she was shot. Castro was taken to the hospital, where she had facial reconstructive surgery.

{¶ 19} The primary issue at trial was the identity of the shooter. Pierce was the best friend of Dewberry's son, George Dewberry Jr., known as "G-Man." Castro testified that Pierce and G-Man were like brothers and that Pierce had a father-son relationship with Dewberry.

{¶ 20} On August 14, 2015, six days before the shooting at issue, G-Man was murdered. Castro testified that Pierce was in bed with her when he learned that G-Man had been shot. Castro stated that Pierce told her that he and G-Man had robbed someone and that the victim of that robbery was possibly coming to "get" him. Castro testified that Pierce and Dewberry had frequent cell phone contact between August 14

and August 20, 2015. Castro indicated that, around August 17, Dewberry told Pierce that they (Dewberry and Pierce) needed to meet so that Dewberry could give Pierce a gun and money so Pierce could protect himself.

{¶ 21} Castro testified that she and Pierce were bickering on August 20 and that they spent the day apart until approximately 10:00 p.m. At that time, the two decided to get food to-go from JJ Chicken & Fish on Gettysburg Avenue. Castro testified that, when they ordered food, Pierce told her that he needed to meet "Bustdown," which is Dewberry's nickname. There was a substantial delay for the food, so Castro and Pierce went to a nearby bar for a while.

{¶ 22} After they returned to the restaurant, Castro went inside to check on the food, which still was not ready. When she came outside, Pierce was using her phone, because his phone's battery had died; Pierce had connected his phone to a car charger. Soon thereafter, Pierce went inside and retrieved the food order and brought it back to the car. Pierce said, "We're going to meet 'Pops' " (who Castro testified was Dewberry), and Castro and Pierce again argued about that. Castro testified that Pierce and Dewberry were in frequent communication. She stated, "Jesse [Pierce] kept calling him, and like calling him, and they were talking about meeting. I never hear the name of the street. I just know once we got the food Jesse was on the phone, and he said, I just got my food, I'm to pull over here, right there." (Tr. at 402.)

{¶ 23} According to Castro, Pierce left the restaurant parking lot, turned right onto Gettysburg, and made another right. (Vina Villa Avenue intersects Gettysburg one block south of JJ Chicken and Fish.) Castro testified that she saw "Bustdown" (i.e., Dewberry) standing on the corner, letting them know he was there. She testified, "I knew it was G-

Man's dad. Me and Jesse had a conversation before we went about who he was meeting and what he was meeting him for." (Tr. at 403.) Pierce pulled over, and Dewberry got into the back seat behind Castro. Castro testified that Pierce called the shooter "Pops" during the meeting. (Tr. at 492.) Castro stated that Pierce and Dewberry spoke about G-Man, Pierce introduced Castro to Dewberry, and then Dewberry said, "So do you still need a strap?" At that juncture, Castro felt herself being shot. After blacking out momentarily, she saw a gun fire a shot at Pierce's head. She passed out again and, upon awaking, tried to play dead.

{¶ 24} After she was sure that the shooter had gone, Castro attempted to perform CPR on Pierce and she called 911 from Pierce's phone. Castro attempted to communicate with the dispatcher, and she accidentally disconnected the call with her face. The dispatcher called right back and received no answer. The dispatcher called a second time, and Castro answered. The police located Castro's vehicle, emergency medical technicians (EMTs) transported Castro to the hospital, and the police began an investigation.

{¶ 25} Detective Geiger went to the hospital on the morning of the shooting and met with Castro in the Intensive Care Unit. Castro was unable to communicate orally, but she could communicate in writing. Castro stated that she was tired, scared, and in pain, but she did not identify her shooter.

{¶ 26} By August 25, Detective DeBorde had identified Dewberry as a suspect and prepared a photographic lineup containing Dewberry's photo. Detective Geiger, who was not aware that Dewberry was a suspect, returned to the hospital and showed the photospread to Castro. Castro did not identify anyone as the shooter. Castro testified

at trial that she knew that Dewberry was the shooter, but she "was scared that he was going to come and kill me, my kids, my family."  (Tr. at 435.)

{¶ 27} On September 5, Detective Daugherty and Detective Tom Cope spoke with Dewberry at Dewberry's apartment.   At that time, Dewberry stated that he had spoken with Pierce every day since his (Dewberry's) son's death and that he (Dewberry) was home at his apartment the entire evening of Pierce's homicide; Dewberry confirmed his cell phone number.

{¶ 28} After Castro was released from the hospital, she moved out of Dayton and decided to contact the police about the shooting.   John Smith, an Air Force attorney, initially contacted Detective Daugherty for Castro.   After Castro spoke directly with Daugherty by phone, she returned to Dayton and met with Detective Daugherty on September 25, 2015.   Castro showed Daugherty a photograph from Facebook of the person who shot her; the photo was of Dewberry.   Castro was shown another photographic lineup, which contained the same individuals as the prior lineup but in a different order.   Castro identified Dewberry as the shooter and indicated that she was 100 percent certain of the identification.   Castro testified at trial that she had met Dewberry for the first time on the night of the shooting, but she had previously seen photos of him and had seen him in person at a party when the Webster Station Bar closed in 2013.

{¶ 29} Dewberry was arrested, taken to the police station for an interview, and subsequently taken to jail.   While Detectives Daugherty and Cope walked Dewberry to the jail, Dewberry repeatedly asked them "what the girl was saying."   The detectives did not respond.   Dewberry then stated, "You'll never get that girl on the stand to testify

against me." (Tr. at 657.)

{¶ 30} In September and October of 2016, while Dewberry was in jail on these charges, he was housed in the same area of the jail as Jason Laraby. Laraby testified at trial that while playing cards, Dewberry twice said, "As long as I don't look like I shot that guy nine times, as long as I don't look like I shot that woman five times, I can get away with it." (Tr. at 611.) Laraby testified that after Dewberry made these statements, Laraby told his then-defense counsel, who was also Dewberry's defense counsel, that counsel had a conflict of interest; Laraby had different counsel at the time of Dewberry's trial.[2] Laraby was awaiting sentencing in an unrelated case at the time of Dewberry's trial, but he testified that no promises had been made for his testimony.

{¶ 31} The State also presented cell phone records in its case against Dewberry. Dewberry's and Pierce's cell phone records indicated that they had communicated throughout the day on August 20, 2015, the day of the shooting. At 10:20 p.m. and 10:52 p.m., Pierce received calls from Dewberry's phone; Dewberry's number was labeled "Big G" in Pierce's phone records. Pierce called Dewberry's phone at 11:14 p.m. and 11:15 p.m. Dewberry tried to reach Pierce at 11:27 and 11:28 p.m. At 11:47 p.m., a call was made from Castro's phone to Dewberry; the call lasted 70 seconds. At 11:51 p.m., Castro's phone received a call from Dewberry's phone; that call lasted 3 minutes and 41 seconds.

{¶ 32} At 11:59 p.m. on August 20, a call to 911 was placed from Pierce's phone.

---

[2] Defense counsel's prior representation of Laraby was the basis of a motion by the State to disqualify counsel. After a hearing on December 6, 2016, the trial court overruled the State's motion in its entirety. The State did not appeal this ruling.

At midnight, the dispatcher from Montgomery County Sheriff's Office called back Pierce's phone number; that call was not answered. A second call-back from the dispatcher was answered.

{¶ 33} Detective Daugherty asked FBI Special Agent Kevin Horan to review Dewberry's phone records to see where Dewberry's phone was located on August 20-21, 2015. Horan analyzed the coverage of the cell towers where the shooting took place and where Dewberry resided; Horan stated it was "not possible" for Dewberry's phone to select the cell tower sector where the homicide occurred and also to be at his residence.

{¶ 34} Horan's analysis demonstrated that Dewberry's phone was at or near his residence between 6:24 and 9:24 p.m. on August 20. Horan analyzed the actual cell tower coverage area where Dewberry's phone was located around the time of the shooting (11:48 p.m. to 11:59 p.m.). During the phone calls between Dewberry and Castro during that time, the phone was located in a coverage area that included an area adjacent to the intersection of Vina Villa Avenue and Gettysburg. The location of the shooting was feet away from the coverage area, but was not inside of it. From 12:03 a.m. to 2:56 a.m. on August 21, Dewberry's phone was in the coverage area for Dewberry's residence, which was located 2.6 miles from the homicide site.

{¶ 35} Dewberry testified on his own behalf and presented eight defense witnesses. Three of Dewberry's daughters testified that Pierce was their brother's best friend and the two were like brothers, that Dewberry had a good relationship with Pierce, and that the family had no reason to believe that Pierce was involved in G-Man's death. The mother of one of Dewberry's children testified similarly and stated that Dewberry had a father-son relationship with Pierce. She also testified that Dewberry was incarcerated

when the Webster Station Bar closed in 2013 (i.e., when Castro allegedly saw Dewberry).

{¶ 36} Jimmie McCray, an employee of the Burger King at Gettysburg and Hoover, testified that, on August 20, 2015, he was on break outside when he saw a vehicle park on Gettysburg at the intersection where the "wedding shop" was located (i.e., Vina Villa). McCray testified that a man got out of the car carrying a gun and a cell phone. The man walked up the grass and started shooting toward the house also located at the corner. McCray saw the man drop his hand, turn around (still on the phone), walk down the grass, walk on the sidewalk alongside of the house, and shoot at the house. McCray further testified that, while this happened, a car pulled up on the street behind him. McCray testified that the man turned and shot at the car while still on the phone. McCray heard six shots toward the house and three shots toward the car. Afterward, the man got back in his car and drove off slowly. McCray went back inside the Burger King. He stated that the police and ambulance "were everywhere" about 15 to 20 minutes later. On cross-examination, McCray indicated that this occurred in the evening, but it was still daylight.

{¶ 37} Dewberry testified that he had a father-son relationship with Pierce and that he had no reason to believe that Pierce was involved in his son's death. Dewberry indicated that Pierce believed that "trouble was coming his way," and Dewberry stated that he gave Pierce $1,000 on August 16 and intended to give him $1,000 more later. Dewberry testified that Castro was with Pierce when Dewberry gave Pierce money. Dewberry stated that Castro could not have seen him at the closing party for Webster Station Bar, because he was incarcerated in a federal prison at that time.

{¶ 38} Dewberry testified that on August 20, 2015, he met with Pierce and Castro

on Lilac Avenue, approximately three to four blocks away from the homicide location. Dewberry stated that they rolled and smoked marijuana and drank alcohol. At approximately 10:30 or 11:00 p.m., Pierce and Castro left to meet some people and get some money (i.e., sell drugs), and Dewberry and Pierce intended to meet again later. (The police located drugs inside Castro's vehicle, and Castro testified that Pierce sold drugs to make money.) Dewberry testified that he drove around for approximately 20 minutes and then went to a location on Kammer Avenue, a couple blocks from the shooting site, where Dewberry and Pierce had a meeting spot. Dewberry testified that he received a phone call from Castro and called her back.

{¶ 39} Dewberry testified that Pierce did not show up at the Kammer meeting spot, and he (Dewberry) returned home. He indicated that he had sent Pierce a text during the early morning hours of August 21, 2015, to remind Pierce that Pierce, Dewberry, and Dewberry's other sons were going to the store to get matching clothes that day (to wear at G-Man's funeral the following day).[3]

{¶ 40} Dewberry testified that, when he spoke with detectives on September 8, he told them that he had gotten home early on the night of the shooting and that he was home for the rest of the evening. Dewberry testified that he told detectives that he had been home by midnight or 12:30 a.m., and that "evening" did not mean sundown to him.

---

[3] Dewberry did not attempt to introduce a copy of the text message. However, State's Exhibit 84b, which included the time and location of Dewberry's incoming and outgoing calls and text messages, showed that Dewberry made an outgoing text message to Pierce's phone at 2:42 a.m. on August 21, 2015. In addition, the content of this text message can be located in an Excel file on the USB drive (State's Exhibit 55, 152381E01_FMF_Report, SMS/MMS Tab, Lines 2098-2099). The text message read, "See u tomorrow son...so we can get fitted."

Dewberry explained his statement upon being taken to jail as meaning that Castro would not get on the stand and testify against him because that would not be the truth. Dewberry denied that he shot Castro and killed Pierce. He stated, "I didn't kill my baby. * * * I helped raise him."

{¶ 41} Dewberry claims that his convictions were based on insufficient evidence and against the manifest weight of the evidence. As stated above, the principal question – and Dewberry's focus on appeal – was the identity of the perpetrator.[4]

{¶ 42} Dewberry argues that Castro's identification of him was not credible; he emphasizes that Castro twice did not identify him and that she admitted to lying to the police repeatedly. He further emphasizes that Castro's statement that she had previously seen him was not credible given that she testified that she had previously seen Dewberry at a location where Dewberry, in fact, was not present. Dewberry further argues that other persons had a motive to kill Pierce or shoot Castro. Dewberry notes that Pierce's cell phone records indicated that Dewberry's cell phone number was associated with the name "Big G", but that a different number was associated with the

---

[4] Dewberry does not discuss the elements of each of his offenses. Nevertheless, the evidence at trial, if believed, amply supported the conclusions that Pierce was murdered and that someone attempted to murder Castro. Moreover, the evidence supported a finding of prior calculation and design, i.e., "advance reasoning to formulate the purpose to kill." *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 18. Pierce made arrangements with the shooter to meet on Vina Villa Avenue. Castro stated that the shooter got into the back seat of the vehicle, and after being introduced to Castro, immediately opened fire on Pierce and her, shooting each victim multiple times at close range. Castro's description of the incident reasonably indicated that the shooter brought the murder weapon with him with the intention of shooting Pierce at the meeting. Finally, for purposes of the charge of having weapons while under disability, the State presented evidence that Dewberry previously had been convicted of possession of cocaine. (*See* State's Exs. 97a and 97b.)

name "Pops." Finally, Dewberry noted that McCray's testimony about the events he observed outside Burger King contradicted the State's theory of the case.

{¶ 43} Viewing the evidence in the light most favorable to the State, the State presented sufficient evidence that Dewberry was the perpetrator. Castro testified that she had previously seen photographs of Dewberry and knew him to be G-Man's father, although she did not know his name prior to the shooting. Castro identified Dewberry as the shooter, and she explained her reasons for not identifying Dewberry to the police shortly after the shooting. Dewberry's cell phone records placed him in a cell phone area that included locations within a block of the murder scene, and Dewberry made potentially incriminating statements to Laraby and others. In short, the State's evidence, if believed, was sufficient to support Dewberry's convictions.

{¶ 44} Moreover, we cannot conclude that Dewberry's conviction was against the manifest weight of the evidence. It was the province of the jury to evaluate Castro's and the other witnesses' credibility. Castro was extensively cross-examined about her failure to identify Dewberry shortly after the shooting, her inconsistent statements about what she and Pierce did during the day prior to the shooting, whether she recognized Dewberry prior to the shooting (including her prior encounter with Dewberry at the Webster Station bar), her break-up with her boyfriend by text on the evening of the shooting, the nickname of the person with whom Pierce had arranged to meet, and that Pierce earned money by selling drugs. In reaching its verdict, the jury was free to believe all, part, or none of the testimony of each witness, including Castro, and to draw reasonable inferences from the evidence presented. *E.g., State v. Baker*, 2d Dist. Montgomery No. 25828, 2014-Ohio-3163, ¶ 28.

**{¶ 45}** We recognize that the evidence at trial included evidence that was favorable to the defense. Castro initially testified that Dewberry was known as "Bustdown" (*see* Tr. at 389) and that Pierce told her that he had made arrangements to meet Bustdown. On cross-examination, Castro testified that Pierce told her that they were going to meet "Pops," that Pierce called the man who got into the car "Pops," and that Pierce referred to Dewberry as "Pops." (*See id.* at 453, 480-481.) The extraction report for Pierce's cell phone (State's Exhibit 56) showed that Dewberry's phone number was associated with the nickname "Big G" and that a different phone number was associated with the nickname "Pops." (The individual listed as "Pops" in Pierce's phone contacts was not identified at trial.)

**{¶ 46}** Nevertheless, Pierce's and Castro's cell phone records further show that Pierce and Dewberry were in communication throughout the day of August 20, 2015. Pierce received calls from Dewberry's phone ("Big G") at 12:25 p.m., 3:04 p.m., 6:22 p.m., 7:47 p.m., 10:20 p.m., and 10:52 p.m. Pierce called "Big G" at 11:14 p.m. and 11:15 p.m. Consistent with Castro's testimony that Pierce's phone had died and that Pierce used her cell phone while his charged, a call was made from Castro's phone to Dewberry's number at 11:47 p.m., and her cell phone received a call from Dewberry's number at 11:51 p.m. A 911 call was made from Pierce's phone at 11:59 p.m. The extraction report contained only one call from Pops, which was a missed call on the morning after the shooting. Dewberry himself testified that he had communicated back and forth with Pierce all day on August 20. Based on this evidence, the jury could have reasonably concluded that the cell phone records supported Castro's testimony that Pierce had made arrangements to meet with Dewberry, and that Dewberry was the

individual who entered Castro's vehicle and shot her and Pierce.

{¶ 47} Dewberry further argues that other persons had a motive to kill Pierce or shoot Castro. Castro testified on cross-examination that, on the day of the shooting, she was breaking off her relationship with Jamichael Thompson so that she could pursue her relationship with Pierce. Castro and Thompson texted throughout the day, and Castro acknowledged that Thompson was upset about the break-up. Detective Daugherty testified that he found threatening texts from Thompson on Castro's phone.

{¶ 48} However, Castro testified that Thompson "always said crazy things" and that she never felt threatened by him. On redirect examination, Castro expressly stated that it was Dewberry, not Thompson, who met with Pierce on Vina Villa, that she would have recognized Thompson if it had been he, and that she would have identified Thompson if he had been the shooter. Detective Daugherty also testified on redirect examination that Castro denied that Thompson was a suspect, and Daugherty stated that Castro was upset when she talked about Dewberry, but not when she discussed Thompson. The jury could have reasonably concluded that Thompson, although a viable suspect, was not the shooter.

{¶ 49} Castro further testified that Pierce had told her that he (Pierce) and Dewberry's son, G-Man, had committed a robbery and that someone was "possibly coming to get him [Pierce]." Pierce had told Castro that Dewberry was going to give him a gun and money to protect himself. Castro further stated that Dewberry and Pierce had a father-son-type relationship. The fact that someone else may have had a motive to shoot Pierce and that Dewberry seemingly had a good relationship with Pierce may have raised questions as to Dewberry's motive for the shooting. However, motive is not an

element of the offenses of which Dewberry was convicted. *See, e.g., State v. Herron*, 2d Dist. Montgomery No. 19894, 2004-Ohio-773, ¶ 57 (motive is not an element of felonious assault or murder).

{¶ 50} Defense counsel elicited testimony from Special Agent Horan that Dewberry's phone was located in the cell phone coverage area located near to the shooting location, but (1) Dewberry's phone could have been anywhere in that coverage area, and (2) the shooting location was not actually within that coverage area. In addition, Horan testified that, at 12:03 a.m., Dewberry's phone was back near his residence, which was 2.6 miles from the site of the shooting.

{¶ 51} Nevertheless, the jury received additional evidence from Horan that the site of the shooting was located within a block of the coverage area within which Dewberry's phone was located. Further, Horan had testified that the location information was based on Dewberry's phone usage. The jury could have reasonably concluded that Dewberry's phone was located within a block of the shooting site when Dewberry spoke with Pierce (who was using Castro's phone) at 11:47 p.m. and 11:51 p.m., and that Dewberry also briefly could have been at the shooting location, which was outside of, but very close to, that coverage area. The jury heard no evidence that it would be impossible for Dewberry to have returned to the coverage area for his residence by 12:03 a.m.

{¶ 52} Finally, Dewberry noted that McCray's testimony contradicted the State's version of events. As with Castro's testimony, the jury was free to believe all, part, or none of McCray's testimony.

{¶ 53} Upon review of the entire record, we cannot conclude that the jury lost its way in crediting the State's version of events. Although the jury heard evidence from

which it could have concluded otherwise, this is not the exceptional case in which we can conclude that the convictions were against the manifest weight of the evidence.

{¶ 54} Dewberry's second assignment of error is overruled.

### III. Motion to Suppress

{¶ 55} In his first assignment of error, Dewberry claims that the trial court erred in denying his motion to suppress Castro's photospread identification. He argues that Castro's eyewitness identification from the second photospread should have been suppressed, because the photospread procedures failed to comply with the requirements of R.C. 2933.83. Dewberry further asserts that he should have been permitted to question Castro at the suppression hearing about her identification.

{¶ 56} In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994); *State v. Knisley*, 2d Dist. Montgomery No. 22897, 2010-Ohio-116, ¶ 30. Accordingly, when we review suppression decisions, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Retherford* at 592. "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

{¶ 57} Four police officers testified at the hearings on the motions to suppress. At the beginning of the March 18, 2016 hearing, the trial court told Dewberry that "there are only certain limited circumstances under which the witness who make [sic] an identification (indiscernible) in that photospread comes to court for purposes of the

motion. I make that determination. And it is not made yet, and unless I determine a certain way, the complaining witness will not be required to come here for the motion to suppress. * * *" (Supp. Tr. at 10-11.) The court later clarified that if it "felt that the witness who identified the defendant in the photospread needed to be brought in, that would be after [the March 29 hearing]." (Supp. Tr. at 44-45.)

{¶ 58} Detective Geiger testified that he was "peripherally involved" in the investigation of the shootings in that he spoke with Castro at the hospital on the day of the shooting and showed her a photospread lineup a couple of days later. Geiger stated that he saw Castro at approximately 9:30 a.m. on August 21; Castro had a tube in her throat and could not speak, but she could communicate by written notes and by moving her head (yes/no). Castro did not provide the name of a suspect at that time.

{¶ 59} During the course of the investigation, the police identified Dewberry as a suspect. Detective Michael DeBorde compiled a six-photo photospread using the Montgomery County Sheriff's Office's JusticeWeb system, which searched for photos similar to Dewberry's. DeBorde selected five photos (plus Dewberry's) from more than 100 possible similar photos. After completing the photospread, DeBorde looked at it and "noticed that every individual [was] fairly like and similar and it wasn't unduly suggestive. It was a good photograph in my mind." (Supp. Tr. at 114.) When the photospread printed, it included the six-person photospread, a key, and the instruction pages and forms. DeBorde testified that State's Exhibit 6 (renumbered as State's Exhibit 2 at trial) was the photospread he created and gave to Detective Geiger. DeBorde identified State's Exhibit 6A as the key for the photospread, providing names and identifiers for the individuals in the photospread; he stated that he did not give the key to Geiger.

{¶ 60} On August 25, Geiger and DeBorde went to the hospital and spoke with Castro. DeBorde told Castro that he wanted her to look at some pictures. DeBorde stepped out of the room, and Geiger showed the photospread lineup to Castro. Geiger testified that he (Geiger) was a blind administrator, i.e., he did not know the identity of any potential suspects, and DeBorde testified that he did not tell Geiger the suspect's name. Geiger noted on the photospread form that Castro's sister was also in the room, but the sister could not see the photospread and did not interact at all. Geiger noted the location, date, and time on the form and read the instructions verbatim.

{¶ 61} Geiger handed the photospread to Castro, who "looked at it for a few minutes" then "handed it back to [him] and shook her head no." Geiger asked Castro if she recognized anyone and she again shook her head no. When asked if he did anything to confirm or deny her failed identification, Geiger testified that he "could not" because he "didn't know the identities of the people in the lineup." Geiger stated that he was not provided the photospread key. Geiger did not complete section 8 of the form, which asked for identification/non-identification and confidence statements made by the witness; Geiger stated that he forgot to mark that she did not make an identification. Geiger also did not mark whether Castro had viewed the lineup more than once, but he testified that she did not. Geiger reported the non-identification to Detective DeBorde.

{¶ 62} Detective Daugherty testified that, sometime after Castro had been shown the initial photospread, he received a telephone call from an attorney (a friend of Castro's sister) on Castro's behalf. The attorney told Daugherty that Castro knew who had shot her, but she was "scared to come forward because she's in fear of her life."

{¶ 63} Later that afternoon, Castro called Daugherty directly. Castro would not

identify her shooter over the phone, but she and the detective made arrangements to meet the following day at the downtown Dayton police station. When they met, Castro told Daugherty that Dewberry had tried to friend her cousin on Facebook, and she (Castro) showed Daugherty a Facebook photo of Dewberry. Castro indicated that the photo was of the shooter. (Daugherty testified that the conversation was audio and video-recorded, but no recording of this interview was offered as evidence at the suppression hearing.) Daugherty prepared a search warrant for the search of Dewberry's residence after Castro's identification.

{¶ 64} After Dewberry's arrest and the execution of the search warrant, Detective DeBorde prepared a second photospread (State's Exhibit 7, renumbered at trial as State's Exhibit 3). He used the same photos as the first photospread, but they printed in a different order. Detective DeBorde met with Castro at the police department, and he asked Officer Kyle Watts to show the photospread to her. DeBorde retained the key for the photospread (State's Exhibit 7A).

{¶ 65} Watts testified that he was asked by Detective DeBorde to show a photospread on September 25, 2015. Watts had not previously been involved in the investigation, and he was unfamiliar with Dewberry and Castro. Shortly before noon, Watts went into an interview room at the police department and introduced himself to Castro. Watts read Castro the photospread instructions verbatim, initialed that he had done so, and noted the date, time, and location. Watts also noted on the form that he was a blind administrator.

{¶ 66} Watts then showed Castro the photospread and told her to circle a photo if she recognized anyone. Castro immediately circled photo number 6 (Dewberry's photo)

and initialed below it. Castro wrote that the person "shot me and killed Jesse" and she indicated that she was 100 percent certain. After the identification, Castro and Watts signed and dated the bottom of page 4. Watts stated that he was not given the key for the photospread. Watts testified that he handed the packet to Detective DeBorde, who noticed that Castro had not signed the bottom of page 3 (the page with six photos). Watts immediately took the packet back to Castro, and she and Watts signed the page. Watts then returned the packet to Detective DeBorde.

{¶ 67} Geiger and Watts were asked about the Dayton Police Department's photospread policy, which was admitted as State's Exhibit 5. (That exhibit was returned to the State and is not part of the record before us.) The officers testified that they believed that they complied with the policy.

{¶ 68} At the conclusion of the hearing, the trial court allowed the parties to file simultaneous briefs on whether it would be appropriate for defense counsel to call Castro as a witness regarding the photospreads. The parties filed memoranda primarily on whether the photospreads were unduly suggestive; defense counsel did not argue that Dewberry had a due process right to call Castro or that her testimony was necessary to establish that the procedures were unduly suggestive.

{¶ 69} The trial court subsequently ruled that the first photospread was conducted in compliance with R.C. 2933.83 and, even if had not, "any impropriety would not have been prejudicial as there was no identification made." With respect with the second photospread, from which Castro identified Dewberry, the court initially concluded that the Facebook photo did not result from police action and that the Facebook photo did not taint Castro's later identification of Dewberry. It further concluded that there was "no evidence

to suggest that the photo line-up shown to Castro by Watts on September 25, 2015 was not properly conducted or was unduly suggestive." The court also concluded that, because Dewberry did not meet his burden of proving that the pretrial identification by Castro was unduly suggestive, Castro was not required to provide pretrial testimony regarding the identification.

{¶ 70} First, Dewberry challenges the denial of his motion to suppress the identification from the second photospread. He states that he is not challenging the first photospread, as Castro did not identify him.

{¶ 71} "Due process requires suppression of pre-trial identification of a suspect only if the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." *Neil v. Biggers*, 409 U.S. 188, 196-97, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

{¶ 72} The defendant must first show that the identification procedure was unduly suggestive. "A lineup is unduly suggestive if it steers the witness to one suspect, independent of the witness's honest recollection." (Citations omitted.) *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 208. If the pretrial identification procedure was not unfairly suggestive, any remaining questions as to the identification's reliability go to the weight of the identification, not its admissibility, and no further inquiry into the reliability of the identification is required. *Id.* at ¶ 209; *State v. Williams*, 2d Dist. Montgomery No. 26357, 2015-Ohio-1403, ¶ 13.

{¶ 73} If, on the other hand, the defendant shows that the pretrial identification procedure was unduly suggestive, the court must then consider whether the identification, viewed under the totality of the circumstances, was reliable despite the suggestive

procedure. *E.g., Williams* at ¶ 13. In reviewing the likelihood that the circumstances resulted in a misidentification, courts have considered the opportunity of the witness to view the perpetrator at the time of the offense, the witness's degree of attention, the accuracy of the witness's prior description of the perpetrator, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.[5] *Neil* at 199-200; *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *State v. Bates*, 110 Ohio St.3d 1230, 2006-Ohio-3667, 850 N.E.2d 1208, ¶ 8.

**{¶ 74}** Reliability of the pretrial identification is the linchpin in determining its admissibility. *Manson* at 114. "So long as the identification possesses sufficient aspects of reliability, there is no violation of due process." *State v. Sherls*, 2d Dist. Montgomery No. 18599, 2002 WL 254144, *3 (Feb. 22, 2002).

**{¶ 75}** We review a trial court's denial of a motion to suppress a pretrial identification for an abuse of discretion. *State v. Wilson*, 2d Dist. Montgomery No. 22624, 2009-Ohio-1038, ¶ 19.

**{¶ 76}** With the record before us, we find no error in the trial court's conclusion

---

[5] We have previously noted that some of the factors identified in *Neil* may bear reconsideration in light of the significant advancement of scientific understanding of memory. *See State v. Frazier*, 2016-Ohio-727, 60 N.E.3d 633, ¶ 18, fn. 1 (2d Dist.); *State v. Moody*, 2d Dist. Montgomery No. 26926, 2016-Ohio-8366, ¶ 12, fn. 3. For example, *Neil* and *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) direct courts to consider the witness's degree of certainty in the identification, yet studies have repeatedly shown little relationship between certainty and accuracy. *See, e.g., State v. Mabberly*, 2d Dist. Montgomery No. 27729, 2019-Ohio-891, ¶ 41, ¶ 44. Nonetheless, as an intermediate court of appeals, this court must continue to follow the factors articulated in *Neil* and *Manson*, as required by Ohio Supreme Court precedent. *See, e.g., State v. Bates*, 110 Ohio St.3d 1230, 2006-Ohio-3667, 850 N.E.2d 1208 at ¶ 9; *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 19, ¶ 25.

regarding the identification procedures employed by the Dayton police during the second photospread lineup. Upon review of the photospread, the photographs presented to Castro were not unduly suggestive. Detective DeBorde used JusticeWeb, which identified numerous photographs using characteristics similar to Dewberry; the photographs selected by Detective DeBorde closely resembled Dewberry. The same six photographs were presented to Castro in both the first and second photospreads (albeit in a different order), minimizing the risk that Dewberry's photo would be selected over the other five due to its prior presentation. A different blind administrator presented each photospread to Castro, and there was nothing in the manner in which Officer Watts administered the second photospread that made its presentation unduly suggestive.

{¶ 77} Dewberry claims that the second photospread should have been suppressed, because Watts violated R.C. 2933.83(B) by failing to have Castro immediately sign the bottom of page three of the photospread packet. R.C. 2933.83, which was enacted in 2010, provides minimum requirements for live lineup and photo lineup procedures. Those procedures include that the administrator of the lineup "shall make a written record that includes * * * [a]ll identification and nonidentification results obtained during the lineup, signed by the eyewitnesses, including the eyewitnesses' confidence statements made immediately at the time of the identification." R.C. 2933.83(B)(4)(a).

{¶ 78} We have noted that, "even if a violation of R.C. 2933.83 occurs, violations of that statute are not independent grounds for suppression." *E.g., State v. McShann*, 2d Dist. Montgomery No. 27803, 2019-Ohio-4481, ¶ 40; *State v. Harmon*, 2017-Ohio-8106, 98 N.E.3d 1238, ¶ 23 (2d Dist.). Rather, we focus on whether "the procedure used

in administering the photospread in this case, while not in compliance with R.C. 2933.83, was 'not so impermissibly suggestive as to give rise to a substantial likelihood of misidentification.' " *Harmon* at ¶ 31, quoting *State v. Moon*, 2d Dist. Montgomery No. 25061, 2013-Ohio-395, ¶ 35. Even assuming that Watts technically violated R.C. 2933.83 when he and Castro initially failed to sign page 3 of the photospread packet, that error was immediately remedied, and we find, on this record, that the procedure employed was not impermissibly suggestive as to give rise to a substantial likelihood of misidentification.

{¶ 79} Dewberry further argues that the trial court erred in precluding him from calling Castro to testify at the suppression hearing. In its ruling, the trial court concluded that Castro was not required to testify, because Dewberry did not establish that the pretrial identification was unduly suggestive.

{¶ 80} In *State v. Rivera*, 2d Dist. Montgomery No. 18845, 2002 WL 91296 (Jan. 25, 2002), we rejected the notion that an eyewitness's testimony is relevant only to the issue of the reliability of an identification. We held that the trial court "abused its discretion when it denied [Rivera's] request to call two eyewitnesses to testify at the suppression hearing in which he was contending that an unduly suggestive photographic identification procedure was used." *Id.* at *1. We noted that the eyewitnesses "would have been the best witnesses on that issue, and they would not have shared the bias of the police officer who testified at the suppression hearing, who presumably would have been interested in avoiding a finding that his police work was flawed." *Id.*; *see also State v. Hand*, 2d Dist. Montgomery No. 22114, 2008-Ohio-1870, ¶ 20, fn. 1 (commenting that the trial judge appeared to have the "misimpression" that eyewitness testimony at the

suppression hearing would only be relevant to the issue of reliability).

**{¶ 81}** The Eighth District held similarly in *State v. Glover*, 8th Dist. Cuyahoga No. 84413, 2005-Ohio-1984. In holding that the trial court erred in precluding defense counsel from calling three witnesses to whom a photospread had been shown (and who were present to testify at the suppression hearing), the appellate court reasoned:

> Here, the trial judge apparently believed that the only issue relevant to the out-of-court identification was whether the photographs contained in the photo array were impermissibly suggestive. However, the issues presented by appellant in the hearing on his motion to suppress were not just the assemblage of the photo array, but also *the procedure employed in presenting the array to the victims.*

> * * *

> By refusing to hear testimony from anyone other than the police officers, the trial court denied appellant the opportunity to present testimony that may have conflicted with that of the police officers regarding the procedures employed in presenting the photo array to the victims. In effect, the trial court adopted the premise that a police officer's testimony must be accepted as true. An officer's testimony is obviously subject to the same tests questions of accuracy and veracity, however, as any other witness' [sic] testimony.

> Moreover, the defendant bears the burden of proving that the out-of-court identification was flawed. Here, by refusing to hear testimony from the witnesses to whom the array had been shown, the trial court denied

appellant a valid opportunity to meet his burden and to confront the witnesses. Contrary to the State's argument that only the State determines who to present as witnesses at a hearing regarding a motion to suppress an out-of-court identification, the defendant clearly has the right to call witnesses to testify at such a hearing.

By denying appellant's request to present testimony from the witnesses to whom the photo array had been shown, the trial court denied appellant a full and fair hearing regarding the photo array and identification procedures. Accordingly, appellant's conviction is reversed and the matter is remanded for a new trial.

(Emphasis sic.) (Citation omitted.) *Glover* at ¶ 18, ¶ 20-22.

**{¶ 82}** As with *Rivera* and *Glover*, we find that there was no reasonable basis to preclude Dewberry from calling Castro to testify at the suppression hearing. Although the Dayton police officers' testimony indicated that their identification procedures for both photospread lineups were not unduly suggestive, Castro arguably could have contradicted the officers' testimony. Castro was in the best position to testify whether an officer emphasized a particular photo to select or otherwise influenced her identification (or lack thereof), or that she perceived the officer's conduct in that manner. Moreover, as stated in *Glover*, the trial court denied defense counsel the opportunity to determine how best to meet Dewberry's burden to establish that the identification procedures were unduly suggestive.

**{¶ 83}** In *Rivera,* we nevertheless concluded the trial court's error was harmless in light of the witnesses' testimony at trial, during which they were extensively examined

concerning the eyewitness identification procedure, and that their testimony would not have been helpful to the defendant in establishing that the procedure was unduly suggestive. *Id.* In this case, however, Castro's trial testimony regarding the three identification opportunities focused on her reasons for twice failing to make an identification at the hospital. While Castro provided some testimony that officers presented two photospreads to her -- once while she was hospitalized and again after she moved from the Dayton area -- her testimony did not detail the identification procedures used by the officers. Thus, unlike *Rivera*, Castro's trial testimony did not reflect how she might have testified about the photospread identification procedures had she been called to testify at the suppression hearing.

{¶ 84} Regardless, under the unique facts of this case, we find that the trial court's denial of Dewberry's request to call Castro as a suppression hearing witness was similarly harmless. Specifically, Castro's trial testimony indicates that, even if the second photospread identification procedures were unduly suggestive, her identification of Dewberry was reliable nonetheless.

{¶ 85} Under certain circumstances, an eyewitness's identification may be found sufficiently reliable, despite the use of unduly suggestive identification procedures by law enforcement. *See, e.g., State v. Henderson*, 2d Dist. Montgomery No. 28241, 2020-Ohio-6 (victim's identification of defendant was sufficiently reliable despite the suggestiveness inherent in a one-person show-up identification procedure); *State v. Gabriel*, 2d Dist. Montgomery No. 24144, 2011-Ohio-4664 (photospread identification was sufficiently reliable due to victims' acquaintance with defendant). For example, in *Gabriel*, we held that, even if the defendant's photo in a six-person photospread were

unduly suggestive, the two victims' immediate identification of the defendant from the photospread was sufficiently reliable where the victims previously told detectives that they knew one of the perpetrators by his nickname, informed the detectives of where the perpetrator went to school, and stated that they knew the perpetrator from a prior encounter. *See also State v. Henderson*, 6th Dist. Lucas No. L-10-1122, 2012-Ohio-1396; *State v. Huff*, 145 Ohio App.3d 555, 763 N.E.2d 695 (1st Dist.2001) (even assuming the identification procedure was unduly suggestive, the identification was nonetheless reliable based upon the witness's prior familiarity with Huff); *State v. Barnett*, 67 Ohio App.3d 760, 768, 588 N.E.2d 887 (4th Dist.1990).

{¶ 86} Similarly, in this case, the evidence at trial indicated that Castro was familiar with Dewberry prior to the shooting and that her identification of him from the second photospread was sufficiently reliable due to that familiarity. Castro testified at trial that she met Pierce approximately a year before the shooting and that Pierce referred to Dewberry's son, known as G-Man, as his brother. Castro was friends on Facebook with G-Man and Pierce. After G-Man was killed on August 14, 2015, there was "a lot of Facebook traffic" about G-Man, which included the posting of several photographs of G-Man and his family. Castro testified that she saw "plenty" of photographs of G-Man's father (i.e., Dewberry) and that she had seen G-Man's father "just around town." Castro did not know G-Man's or his father's first and last names; she knew G-Man's father by his nickname, Bustdown, and she knew that Pierce called him "Pops."

{¶ 87} At trial, Castro also recalled seeing G-Man's father several years before at the Webster Station Bar when it had a closing-down party. On cross-examination, Castro indicated that she was dating someone else at that time and did not know then

who Dewberry or his sons were. Castro explained that her then-boyfriend knew Dewberry and was speaking with Dewberry at the bar, and that the boyfriend told Castro who he was. Although Dewberry presented evidence that he was in prison when the Webster Station bar closed, Castro's testimony indicated that she became more familiar with G-Man's father after she began dating Pierce, G-Man's best friend.

{¶ 88} Castro testified at trial that, on the night she and Pierce were shot, Pierce told her that he needed to meet Bustdown after getting food at the restaurant; Castro testified that Pierce kept calling Bustdown just prior to the shooting. Castro stated that after getting their food, Pierce drove the car around the corner, and Castro saw Bustdown standing on the corner. Bustdown got into the rear passenger area of the car, and Pierce introduced her to Bustdown. Immediately afterward, Pierce and Castro were shot. Castro testified that she knew who had shot her and Pierce, but she did not tell the police immediately out of fear for her and her family's safety.

{¶ 89} When asked when she learned the first and last names of Bustdown, Castro testified:

A: I knew his name the same day that I was in -- when I first went to the hospital. Once I got to the hospital I had my sister bring my other cell phone that I was currently letting my daughter use and I got on Facebook and I went right to the page.

Q: What page did you go to?

A: George Dewberry, Sr. He was friends with Jesse [Pierce] on there.

{¶ 90} Castro testified that, after being released from the hospital and leaving the Dayton area, she was willing to identify her shooter. When she returned to Dayton, she

showed Detective Daugherty a Facebook "friend request" from Dewberry, which had his name and photograph. Castro stated that she had seen the person in the Facebook photo previously – in Facebook photos, in person, and on the night of the shooting as the person who got into the car behind her. Following Castro's identification of Dewberry as the shooter, the police presented her with the second photospread from which she identified Dewberry.

{¶ 91} Although there was some evidence at trial that Dewberry was not actually at the Webster Station bar's closing party, Castro's testimony indicated that Dewberry was not a stranger to her and that she knew who he was, even if she had not spoken with him personally, prior to the shooting. Even assuming that Castro were to testify that police procedures during the presentation of the second photospread were unduly suggestive, the record reflects that Castro's identification of Dewberry as the shooter was sufficiently reliable to warrant its admission at trial. Accordingly, the trial court did not commit reversible error in denying Dewberry's motion to suppress Castro's pretrial identification.

{¶ 92} Dewberry's first assignment of error is overruled.

## IV. Failure to Admit Text Messages

{¶ 93} In his third assignment of error, Dewberry claims that the trial court erred in not allowing defense counsel to introduce text messages sent to/from Castro's ex-boyfriend, Thompson. In his fourth assignment of error, Dewberry argues, alternatively, that his trial counsel provided ineffective assistance when he failed to present the text messages during Castro's testimony. Dewberry argues that the text messages were relevant and material to his defense.

**{¶ 94}** Defense counsel cross-examined Castro about the texts that she sent and received from Thompson throughout the day of the shooting. As stated above, Castro acknowledged that she was breaking off her relationship with Thompson so that she could pursue her relationship with Pierce and that Thompson was unhappy about the break-up. Defense counsel and Castro had the following exchange:

Q     Okay. Did you go back and forth with him [Thompson] about this breaking it off with him?

A     Yes, sir.

Q     He didn't like it, did he?

A     No, he didn't.

Q     And in fact he threatened you on a text, didn't he?

A     I don't know remember what the texts were about. But I remember me telling him that it was over.

Q     Did you take it as a threat?

A     No. I didn't take it. I didn't feel threatened by him at all.

Q     Okay. So you didn't say, "So you saying you gonna kill me n'icca?"[6] N-I-C-C-A, kill me? Did you text that?

A     I don't remember. I don't remember that.

Q     With exclamation points?

A     I don't remember.

Q     That would be about 11:46 p.m. that night, minutes before you were

---

[6] The text message actually reads, "So u sayin u gone kill me nicca!!☺" (State's Ex. 55, 152381E02_FMF_Report, Messages Content Tab, Line 1239.)

shot?

A      Yes. I mean -- I know we were texting, but I don't exactly remember what was in those texts.

Q      And then you say, "Really, bye asshole," to him.

A      Yes, sir.

Q      Okay. But you're -- it sounds like you're pretty upset, right?

A      No, I mean, I wasn't upset.   It was over with us.   So there was no reason for me to be upset.   He always said crazy things.

Q      You don't recall the "kill me" text that you said --

A      No, I really don't.

Q      -- "you're going to kill me"?

A      I don't remember, sir.

(Footnote added.) (Tr. at 470-471.)

{¶ 95} On redirect examination, Castro stated that it was Dewberry, not Thompson, who met with Pierce on Vina Villa, that she would have recognized Thompson if he had been the person who met them, and that she would have identified Thompson to the police if he had been the shooter.   She repeated on recross-examination that she "would have told on Jamichael right away."   (Tr. at 498.)   She explained, "I know his family, sir.   So I wasn't scared of his family. * * * If Jamichael would have shot me, I wouldn't have had a problem because he has nobody to do dirt for him, like George does."   (Tr. at 499-500.)   Defense counsel brought up Castro's text again:

Q      So when you said, "So you're going to kill me, n'icca," it was not --

A      I don't remember that -- me texting that.   But I did not fear Jamichael

Thompson.

(Tr. at 501.)

{¶ 96} The State's next witness was Christopher Cox, the forensic examiner who testified about the data from Pierce's and Castro's cell phones. Cox identified a thumb/USB drive that contained all of the information that he extracted from the two phones. (*See* Exhibit 55, Tr. at 510.) The State also presented Exhibits 56 and 57, which were extraction reports for the two phones, respectively, that contained call logs for August 20-21, 2015. Cox testified about various phone calls that were made from the phones on the day of the shooting. The prosecutor did not ask any questions regarding text messages from Pierce's or Castro's phone.

{¶ 97} During cross-examination, defense counsel sought to question Cox about specific text messages from the two phones. Counsel began by referring to four reports that he received during discovery. Cox described the first report, saying: "The first report is based off of the Samsung extraction reports [from Pierce's phone]. It contains all call logs, SMS messages, MMS messages, and chat messages between August 20th, 2015 and August 21st, 2015." When asked if this was the report that "we saw earlier," Cox replied, "No. The one that you saw may contain the call logs." (Tr. at 522.) Cox stated that there was a similar report containing all call logs, SMS, MMS, and chat messages between August 20-21, 2015, for the LG phone (Castro's phone). The record did not reflect that the extraction report for the LG (Castro's) phone that contained the text messages was marked and offered into evidence. Cox indicated that the other two reports were filtered reports, which had no time restrictions but phone number restrictions. The Samsung report (Pierce's phone) was marked as Defense Exhibit A; only the front

page of the report is in the record.

{¶ 98} At this juncture, the prosecutor objected, stating "I believe he's [defense counsel] trying to show the jury hearsay statements that were made in text messages. * * * He [Cox] can authenticate, which is what he did. * * * But I don't think he [Cox] can testify about the hearsay statements." (Tr. at 527.) The trial court permitted defense counsel to ask Cox about a message sent from Castro's phone to Pierce's phone at 8:05:50 p.m. on August 20, 2015 that read, "Okay. On my way." (Tr. at 530.)

{¶ 99} Defense counsel next attempted to ask Cox about a text message sent from Castro to Thompson at 9:12 p.m.[7] In a sidebar discussion, the State objected on hearsay grounds. The court sustained the objection. Defense counsel then indicated during the sidebar discussion that he wished to ask about the text, "So you say you're going to kill me n'icca?" The State objected, arguing that Castro had denied making the statement and defense counsel never showed that text to Castro. The court was unsure that Castro had actually denied sending the text, but it sustained the State's objection, reasoning that Castro was not shown the text. (Tr. at 533.) After the trial court sustained the State's objections, defense counsel did not ask Cox any further questions.

{¶ 100} A trial court has broad discretion to admit or exclude evidence, and its exercise of that discretion will not be disturbed on appeal absent an abuse of discretion.

---

[7] In his appellate brief, Dewberry indicates that the text read, "You know what im so wrong babe i have a boyfriend and I've been playing him for you but i gotta cut it out im sorry but im about to go public to make it up i know you won't speak to me anymore im sorry for hurting u but iont want to hurt anyone else bye babe." During questioning, defense counsel referred Cox to line 90 on page 10 of a report. There is no printed exhibit that corresponds to that page/line reference, but this text message can be located in an Excel file on the USB drive (Exhibit 55, 152381E02_FMF_Report, Messages Content Tab, Line 1160).

*State v. Norris*, 2d Dist. Montgomery No. 26147, 2015-Ohio-624, ¶ 14. "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34.

{¶ 101} Dewberry's argument rests on his assertion that the text messages were relevant to his defense. Relevant evidence is generally admissible whereas irrelevant evidence is not. Evid.R. 402. "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. We accept that the text messages between Castro and Thompson were relevant to Dewberry's defense theory that another individual (i.e., Thompson) had a motive to kill Castro and Pierce. However, the statements must also be otherwise admissible.

{¶ 102} Evid.R. 801(C) defines hearsay as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." A "statement," as included in the definition of hearsay, is an oral or written assertion or nonverbal conduct of a person if that conduct is intended by him as an assertion. Evid.R. 801(A). "An 'assertion' for hearsay purposes 'simply means to say that something is so,' e.g., that an event happened or that a condition existed." (Emphasis and citations omitted.) *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 97. Assertions can generally be proven true or false. *Id.* In general, hearsay is not admissible. Evid.R. 802.

{¶ 103} Neither of the two excluded text messages from Castro to Thompson

constituted hearsay. Both were offered for the fact that the content of text messages were said, but not for the truth of the content of the messages. In addition, Castro's question to Thompson was not an assertion. Accordingly, the trial court erred to the extent that it precluded defense counsel from questioning Cox regarding the messages on that basis.

{¶ 104} The trial court apparently perceived defense counsel's attempt to offer the text, "So you say you're going to kill me n'icca?" for impeachment purposes as a prior inconsistent statement. Evid.R. 613(B) contemplates the use of extrinsic evidence of a prior inconsistent statement, provided that certain circumstances exist. *See State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 125. Under that Rule, extrinsic evidence of a prior inconsistent statement is admissible:

> (1) If the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require;
>
> (2) The subject matter of the statement is one of the following: (a) A fact that is of consequence to the determination of the action other than the credibility of a witness; (b) A fact that may be shown by extrinsic evidence under Evid.R. 608(A), 609, 616(A), or 616(B); (c) A fact that may be shown by extrinsic evidence under the common law of impeachment if not in conflict with the Rules of Evidence.

{¶ 105} " 'When extrinsic evidence of a prior inconsistent statement * * * is offered into evidence pursuant to Evid.R. 613(B), a foundation must be established through direct

or cross-examination in which: (1) the witness is presented with the former statement; (2) the witness is asked whether he [or she] made the statement; (3) the witness is given an opportunity to admit, deny or explain the statement; and (4) the opposing party is given an opportunity to interrogate the witness on the inconsistent statement.' " S*tate v. Robinson*, 2d Dist. Montgomery No. 26441, 2015-Ohio-1167, ¶ 27, citing *State v. Mack*, 73 Ohio St.3d 502, 514-515, 653 N.E.2d 329 (1995).   If the witness admits making the conflicting statement, then there is no need for extrinsic evidence.   If the witness denies making the statement, extrinsic evidence may be admitted, provided the opposing party has an opportunity to query the witness about the inconsistency, and provided the "evidence does not relate to a collateral matter[.]"   *Id.* at ¶ 28, citing *State v. Pierce*, 2011-Ohio-4873, 968 N.E.2d 1019, ¶ 82 (2d Dist.).

{¶ 106} In this case, Castro indicated that she did not recall sending the particular text message regarding a threat by Thompson to kill her.   "[I]f the witness says he [or she] cannot remember the prior statement, 'a lack of recollection is treated the same as a denial, and use of extrinsic impeachment evidence is then permitted.' " *State v. Fair*, 2d Dist. Montgomery No. 24388, 2011-Ohio-4454, ¶ 57, quoting *State v. Harris*, 2d Dist. Montgomery No. 14343, 1994 WL 718227, *7 (Dec. 21, 1994).   *See also State v. Reed*, 155 Ohio App.3d 435, 2003-Ohio-6536, 801 N.E.2d 862, ¶ 30-31 (2d Dist.) (witness's lack of memory regarding her first interview with the police laid a foundation for the admission of extrinsic evidence, such as the testimony of the detective, regarding her prior statements); *State v. Spaulding*, 2017-Ohio-7993, 98 N.E.3d 1057, ¶ 16 (6th Dist.) (a claim that a witness cannot remember is treated the same as a denial under Evid.R. 613(B)); *State v. Arnold*, 147 Ohio St.3d 138, 2016-Ohio-1595, 62 N.E.3d 154, ¶ 16, fn.

2 (citing *Reed*). Here, defense counsel laid a sufficient foundation for the presentation of extrinsic evidence regarding that message for purposes of impeaching Castro's credibility.

{¶ 107} Nevertheless, we find that error to be harmless beyond a reasonable doubt. Although the content of Castro's message to Thompson was not evidence due to Castro's testimony that she did not remember the text, *see State v. Johnson*, 2015-Ohio-5491, 55 N.E.3d 648, ¶ 74 (facts incorporated into questions do not constitute evidence when the assumptions contained within the question are denied), the jury repeatedly was made aware of Thompson's threatening message to Castro shortly before the shooting and Castro's reply. Notably, Detective Daugherty acknowledged that, during the course of the investigation, the police found threatening text messages to Castro from Thompson, her ex-boyfriend. (Tr. at 658.) Daugherty further testified that Castro received those texts very close to the time of the shooting.

{¶ 108} Defense counsel also discussed the text messages and Thompson, without objection, during closing statements. Counsel stated:

Let's talk about Jermichael[8] Thompson a moment. I asked her [Castro] about text messages that she might have sent that night to this person and she admitted, "Sure, Jermichael Thompson. He's also Mike Measy (phonetic). Yeah, I know who that is. Yeah, we text back and forth, texted back and forth that whole day." Okay. But, you know, I asked her about, did he threaten you? She was evasive, she was evasive,

---

[8] The transcript is inconsistent about the spelling of Thompson's first name (Jamichael v. Jermichael). It is unclear which spelling is correct.

doesn't know, doesn't remember, is not sure.

I asked her about her sending to him at 11:46, minutes before the shooting, "So are you saying you're going to kill me, nigga" exclamation point. She says, "I don't know. I don't recall that." Doesn't recall that? That's a pretty big point of interest, that she is threatened and responds with, "You're going to kill me?" I ask her, doesn't deny it. I mean, it seems to me this guy would be a pretty big point of interest, a person of interest. Doesn't deny, doesn't remember, not sure, being evasive. Again, evasive when she's providing testimony on that witness stand. Does that indicate a lake [sic] of credibility? It should, because she's not just evasive about that, she's evasive about many different things that I ask her about, about that day.

Let's talk about this Jermichael Thompson a little bit more because interestingly enough, Detective Daugherty testifies he knows about the threats that she received, but he says he dismissed this guy pretty quickly. I mean, within milliseconds apparently from what you hear. Laura [Castro] said he's not a suspect is what Detective Daugherty said. And I asked him because I couldn't believe it, it's in his report, and he said, yes. Laura said he's not a suspect, that's good enough for me. Okay. I'm thinking he's the detective and he's investigating the case, he might want to dig in a little bit more. So you had the description of the guy. He's a, you know, fat black guy. "Did you look at Jermichael Thompson, whether he might fit that?"

"Yeah, I looked at his height and weight. He didn't match the

description."

"Okay. Did you bring him in?"

"No, no, I looked at his height and weight on some records somewhere."

"When was that?   What date was that?"

"I don't know.   I just saw his height and weight didn't match it."   Did he interview him, at least ask him a couple of questions about where he was and -- anything?   No. Who is this guy?   At least eliminate him.   Laura -- no, Laura said no.   I guess it's impossible that she could be protecting this guy.   I know, I know, maybe that is imaginary, you know, that somebody could possibly do that.   But then again, why George?

* * *

{¶ 109} In short, viewing the trial as a whole, we conclude that the exclusion of the precise language of the text messages had no bearing on the outcome of Dewberry's trial.   Accordingly, Dewberry's third assignment of error is overruled.

{¶ 110} Dewberry further claims, in the alternative, that his trial counsel rendered ineffective assistance regarding the text messages.   He argues that defense counsel should have laid a proper foundation for the admission of the text messages and that the failure to get the text messages before to jury prejudiced him.

{¶ 111} To establish ineffective assistance of counsel, a defendant must demonstrate both that trial counsel's conduct fell below an objective standard of reasonableness and that the errors were serious enough to create a reasonable probability that, but for the errors, the outcome of the case would have been different.

*See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373 (1989). Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992); *State v. Fields*, 2017-Ohio-400, 84 N.E.3d 193, ¶ 38 (2d Dist.). Trial counsel is also entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland* at 689.

{¶ 112} Even assuming, for sake of argument, that defense counsel should have taken additional steps to ensure the admission of Castro's text messages, we conclude that Dewberry was not prejudiced by counsel's actions. As stated above, even without the exact wording of the text messages, the jury was aware that Thompson had sent Castro threatening texts shortly before the shooting. We find no reasonable probability that the outcome of Dewberry's trial would have been different had the text messages themselves been admitted. Dewberry's fourth assignment of error is overruled.

### V. Testimony by Detective about Conversation with Attorney Smith

{¶ 113} In his fifth assignment of error, Dewberry claims that the trial court erred in allowing Detective Daugherty to testify about John Smith's statements that Castro was in fear and wanted protection and about Smith's employment.

{¶ 114} On direct examination, Detective Daugherty testified that he was contacted on his cell phone by John Smith, who presented himself as an attorney who had spoken with Castro. Over defense counsel's objection, the prosecutor asked Daugherty what the general topic of his conversation with Smith was. Daugherty replied,

"Laura being in fear of her life, and whether or not we could protect her and offer her like some type of witness protection program." (Tr. at 646.) A few moments later, the prosecutor asked Daugherty if he knew where Smith worked. Daugherty replied, without objection: "I do now. At the time he just said he was an attorney with the Air Force. I know now that he works at Wright Patterson Air Force Base as an attorney." (Tr. at 647.)

{¶ 115} Dewberry argues that Daugherty's response about the topic of conversation was hearsay and should have been excluded. Specifically, Dewberry states: "[Smith's] testimony is not only providing hearsay that Castro had relayed to Smith she was in fear and wanted protection, but also is hearsay as it relays what Smith said to Daugherty." Dewberry emphasizes that Castro's credibility was "paramount" at trial, and her reasons for twice not identifying Dewberry were a critical issue.

{¶ 116} We agree with Dewberry that Daugherty's testimony regarding the nature of his conversation with Smith was hearsay. Even though Daugherty did not provide any verbatim statements by Smith, Daugherty's testimony conveyed that Castro told Smith (for the truth of the statement) that she was in fear for her life and that she wanted to know what protection could be offered to her by the police. We see no non-hearsay purpose for the admission of that statement other than for the truth of the matter asserted.

{¶ 117} Nevertheless, even accepting that Daugherty's testimony in this regard was hearsay, we find it to be harmless beyond a reasonable doubt. The admission of hearsay statements may be harmless when the hearsay statement is merely cumulative of other testimony, particularly when the declarant has previously testified. *See, e.g., State v. Strange*, 2d Dist. Montgomery No. 28200, 2019-Ohio-4188, ¶ 30 (any error in admitting a witness's testimony that the victim told him that the defendant's mother had

threatened the victim was harmless when the victim herself testified regarding the same encounter prior to the witness's testimony, and his testimony was consistent with and merely cumulative of the victim's testimony). *See also State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 59 (any error in admitting hearsay statements by two witnesses was harmless when the witnesses' testimony "was merely cumulative").

{¶ 118} Here, Castro had previously testified regarding her conversation with Smith and her reasons for twice failing to identify Dewberry while at the hospital. Castro testified that she was afraid after seeing herself identified on local news reports. When asked why she did not identify Dewberry's photo when she was presented with the first photospread, Castro responded:

> Because I was scared that he was going to come and kill me, my kids, my family, and I was in the hospital and there was no way that I can get out. There was nothing I can do. I had my children, my father, my sister and my stepmother and I felt like if I told the police who he was while I was in the hospital, he would send somebody up to the hospital to finish what he intended on doing in the first place, and I was so scared that all I wanted to do was leave the hospital.

(Tr. at 435.)

{¶ 119} Castro further testified that she left Ohio out of concern for her safety and that she "waited until I was all the way out of Ohio" before talking to the police about who had committed the shooting. Castro indicated that she called Smith "[b]ecause I wanted to make sure that we would be safe. I wanted to go to the police and tell the police who it was, but I wanted to make sure our safety was first." (Tr. at 437.) Castro indicated

that Smith called the Dayton police, and then the police called her and asked her to come back.   When asked if the police offered any type of protection, Castro testified that the police "made sure I got out of here, packed up our stuff and stuff * * * [and] reimbursed me for a U-Haul trailer."   (Tr. at 437-438.)   She reiterated that she "was scared to death, and I just felt like I needed to get out of the hospital and move my family away before going to the police."   (Tr. at 441.)

{¶ 120} In light of Castro's extensive testimony regarding her fearfulness, her flight from Dayton, and her reasons for delaying her identification of Dewberry as the shooter, we conclude, beyond a reasonable doubt, that the outcome of Dewberry's trial was not affected by Detective Daugherty's isolated response that he talked with Smith about Castro's fearfulness and about whether the police could protect her.

{¶ 121} Dewberry also asserts that he was prejudiced by Daugherty's testimony that Smith worked at Wright Patterson Air Force Base.   Dewberry states that "[t]his detail was not small," because many jurors in Montgomery County have connections with or know people who work at WPAFB and most jurors "tend to have a respect for authority and the military."   Dewberry claims that "this bit of hearsay about Smith's workplace likely added credibility to Castro's claim of being in fear and needing protection."

{¶ 122} Because Dewberry did not object to the question regarding Smith's place of employment, we review the matter for plain error.   *State v. Dalton*, 2019-Ohio-4364, __ N.E.3d. __, ¶ 12 (2d Dist.) ("Failure to object to the admission of evidence waives all but plain error.").   "Plain error exists 'if the trial outcome would clearly have been different, absent the alleged error in the trial court proceedings.' " *State v. Kessel*, 2019-Ohio-1381, 133 N.E.3d 1086, ¶ 33 (2d Dist.), quoting *State v. Bahns*, 185 Ohio App.3d 805, 2009-

Ohio-5525, 925 N.E.2d 1025, ¶ 25 (2d Dist.). Viewing the evidence at trial as a whole, we cannot conclude that the outcome of Dewberry's trial would have been different had Daugherty's testimony that Smith worked as an attorney at WPAFB been excluded.

{¶ 123} Dewberry raises, in passing, that he was denied the right to confront Smith, who did not testify. "[T]he [United States] Supreme Court has recognized that a defendant's Sixth Amendment right to confront witnesses against him is violated when an out-of-court statement that is testimonial in nature is admitted into evidence without the defendant having had the opportunity to cross-examine the declarant." *State v. Eicholtz*, 2d Dist. Clark No. 2012-CA-7, 2013-Ohio-302, ¶ 26, citing *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

Testimonial statements include statements " 'that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " *State v. Kelley*, 2d Dist. Clark No. 2011 CA 37, 2012-Ohio-1095, ¶ 58, quoting *Crawford* at 52. " '[S]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.' " *Eicholtz* at ¶ 26, quoting *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), paragraph one of the syllabus.

*State v. Kerr*, 2d Dist. Montgomery No. 26686, 2016-Ohio-965, ¶ 22.

**{¶ 124}** "The admission of hearsay does not violate the Confrontation Clause if the declarant testifies at trial." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 64, citing *California v. Green*, 399 U.S. 149, 155, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). Smith did not testify at trial, but Castro did, and it was content of Castro's hearsay statements to Smith that was the primary basis of Dewberry's claim. Castro testified at trial about her fear of Dewberry and of the assistance she received from the police when leaving the Dayton area. Dewberry's counsel had an opportunity to cross-examine Castro on those topics. Under these circumstances, the admission of the hearsay statement did not violate the Confrontation Clause.

**{¶ 125}** Dewberry's fifth assignment of error is overruled.

### VI. Testimony About Location of Defendant's Cell Phone

**{¶ 126}** In his sixth assignment of error, Dewberry claims that the trial court erred in allowing the State, on redirect examination, to elicit testimony from Special Agent Horan that Dewberry's phone was not at his residence when the shooting occurred. Dewberry argues that the State's question exceeded the scope of cross-examination.

**{¶ 127}** In general, the redirect examination of a witness cannot exceed the scope of the cross-examination. *State v. Rucker*, 2018-Ohio-1832, 113 N.E.3d 81, ¶ 59 (8th Dist.); *Saker Family Trust v. Elio Internatl., Inc.*, 10th Dist. Franklin No. 99AP-945, 2000 WL 726791, *2 (June 6, 2000). However, the "control of redirect examination is committed to the discretion of the trial judge and a reversal upon that ground can be predicated upon nothing less than a clear abuse thereof." *State v. Wilson*, 30 Ohio St.2d 199, 204, 283 N.E.2d 632 (1972). "A trial court abuses its discretion when it makes a

decision that is unreasonable, unconscionable, or arbitrary." (Citation omitted.) *Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34.

{¶ 128} During the State's direct examination, Special Agent Horan testified about the location of Dewberry's cell phone. Initially, he described how cell phones communicate with cell phone towers through specific radio frequencies and that cell phone towers are typically designed to cover a 360-degree circle, which generally is divided into three 120-degree sectors. He stated that cell phones communicate with the towers when, for example, phone calls are made, text messages are sent, or data is used.

{¶ 129} Horan further explained that the actual coverage area for each sector varies based on such things as the topography of the area, buildings, and even the amount of tree foliage. Horan conducted a drive test to map the actual coverage area for the sector of the tower "in the area of where the homicide occurred" (Tr. at 689) (displayed on State's Ex. 86 in blue) and for the tower for Dewberry's residence. Dewberry's residence straddled the line between two sectors (shaded in green and purple in State's Ex. 86).

{¶ 130} Horan testified that it was not possible for Dewberry's phone to be at home and, at the same time, to be in the area where the homicide occurred, because "the radio frequency for the tower, where the homicide occurred, which is blue, does not appear anywhere near or at where the two sectors that service where the residence is." (Tr. at 689.) Looking at the location of Dewberry's phone when the two phone calls between his phone and Castro's phone occurred (between 11:49 and 11:59 p.m.), Horan testified that "there's a radio frequency that could have been obtained [by Dewberry's phone] very close to where the crime occurred." (Tr. at 690.) From 12:03 a.m. to 2:56 a.m.,

Dewberry's phone was "back where it had been earlier in the evening." (Tr. at 691.)

{¶ 131} On cross-examination, Horan distinguished between historical data and "pinging," which is real-time location data. Horan stated that pings can provide more accurate location information, whereas historical data shows only cell site and sector. Horan acknowledged that Dewberry's phone could have been located in any of the blue-shaded area and that the data did not pinpoint Dewberry's exact location at the time of the homicide. Horan further acknowledged that the location of the shooting was not actually within the blue area.

{¶ 132} During redirect examination, the prosecutor asked Horan:

[PROSECUTOR:] Okay. Let me ask. Assuming this homicide occurred just before midnight on August 20th of 2015, can you tell me, in the analysis that you performed and looking at the records, would it be possible, at that time, just before midnight, for the Dewberry phone to have been at the Dewberry residence?

Defense counsel objected, but the trial court overruled the objection. Horan then responded:

THE WITNESS: It would not have been there, no.

[PROSECUTOR:] And can you explain why?

[THE WITNESS:] Because, number one, we know the phone selected this tower and sector, so it had to be here, physically. And secondly, the radio frequencies that cover the Dewberry residence do not appear in this area, nor do these radio frequencies appear where the Dewberry residence is; so they're distinct area.

(Tr. at 698-697.)

{¶ 133} We find no abuse of discretion in the trial court's decision to permit the prosecution's question on redirect examination. During cross-examination, defense counsel elicited testimony indicating that Dewberry's phone was not necessarily near the homicide site when it was in the blue-shaded area and that the shooting was not actually in the blue area. The prosecutor's question about whether Dewberry's phone could have been at his residence logically stemmed from defense counsel's similar questions about where Dewberry's phone could have been (other than the site of the shooting) when the shooting occurred. Moreover, the prosecutor's question did not raise a new, previously-unaddressed subject. Special Agent Horan previously had testified during direct examination that Dewberry's residence and the location of the shooting involved separate towers and sectors and that Dewberry could not be at the two locations simultaneously.

{¶ 134} Dewberry's sixth assignment of error is overruled.

### VII. Cumulative Error

{¶ 135} In his seventh assignment of error, Dewberry claims that he was denied a fair trial as the result of the cumulative effects of multiple errors committed during his trial.

{¶ 136} The cumulative error doctrine provides that a conviction may be reversed "where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial[,] even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995); *see State v. Moody*, 2d Dist. Montgomery No. 26926, 2016-Ohio-8366, ¶ 129. Although Dewberry's trial was not without error, upon review of the record, we cannot conclude that the errors collectively deprived Dewberry of a fair trial.

{¶ **137**} Dewberry's seventh assignment of error is overruled.

## VIII. Conclusion

{¶ **138**} The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

TUCKER, P.J., and DONOVAN, J., concur.

Copies mailed to:

Mathias H. Heck
Sarah E. Hutnik
Lucas W. Wilder
Hon. Barbara P. Gorman